# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| NIGEL and KATHLEEN DOUGLAS, and the marital community thereof,<br><br>    Respondents,<br><br>    v.<br><br>TERRY VISSER and DIANE VISSER, and the marital community thereof,<br><br>    Appellants. | No. 67242-8-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION<br><br><br>FILED: February 25, 2013 |

APPELWICK, J. — When prospective homebuyers discover evidence of a defect, the buyers must beware. They are on notice of the defect and have a duty to make further inquiries. Prior to listing a house for sale, the Vissers made superficial repairs that concealed significant rot damage and made no disclosure of the defect to the buyers. During a prepurchase inspection, the Douglases discovered areas of rot but nevertheless purchased the house without making further inquiries about the rot. The trial court did not find that further inquiry would have been fruitless. The Douglases cannot now obtain relief by asserting that the defect was worse than anticipated. We reverse.

## FACTS

In 2007, Nigel and Kathleen Douglas were looking for a home in Blaine, Washington. They are Canadian citizens and wanted a second home in the area. In the course of the search, they discovered a property owned by Terry and Diane Visser. Visser is a licensed real estate agent and listed the property himself.

The Vissers purchased the property in 2005. At the time, it needed significant work. The Vissers intended to renovate and rent the property. They demolished

bungalows that were located on the property. In the main house, they renovated the bathroom, repaired portions of rot, insulated the exterior walls, fixed wall paneling, insulated the ceiling, installed Styrofoam ceiling tiles, and replaced the exterior bellyband. During the course of repairs, the Vissers realized that the renovations would take more time and money than they expected and decided to sell the house.

After the Douglases made an offer, the Vissers filled out a seller disclosure statement. But, they answered, "don't know" or simply failed to respond at all to many questions that the Douglases felt should have had a clear "yes" or "no" answer. Perplexed, the Douglases sent a list of follow-up questions. In addition to seeking clarification, they requested a copy of the inspection report prepared before the Vissers purchased the property. Diane Visser handwrote responses to the questions, but the Douglases continued to think the answers were inadequate. The Vissers never provided a copy of the inspection report. Nevertheless, the Douglases did not ask for any further clarification.

Dennis Flaherty performed a prepurchase inspection for the Douglases. He discovered a small area of rot and decay near the roof line, and caulking that suggested a previous roof leak in the area. Beneath the home, he found an area of rotted sill plate that sat below the section of water damaged exterior siding. A portion of sill adjacent to the rotted section had recently been replaced. Floor joists adjacent to the rotted area had been sistered. In his inspection report, he noted that those areas did not pose a structural threat, but should be repaired if the condition degraded rapidly.

The Douglases did not discuss the report with Flaherty or the Vissers. They purchased the house without discussing the issue of rot with the Vissers. The sale

2

closed in April 2007. The parties agreed on a purchase price of $189,000. The Douglases paid $40,000 cash, and gave the Vissers a promissory note secured by a deed of trust for the remaining $149,000. The total amount was due on August 1, 2008.

After purchasing the house, the Douglases began to notice a damp smell and a constant presence of potato bugs around the perimeter of the house and in the bathroom. In an effort to keep out the potato bugs, they caulked the baseboards in the bathroom. Eventually, they noticed that the ceiling tiles were gradually separating in the living room, master bedroom, and second bedroom.

Flaherty returned to inspect the home again. When he removed a ceiling tile, insulation and water came down from behind it. In response to what they found, the Douglases requested a bid from a mold abatement company. The company was unable to guarantee the removal of all mold because of the house's pristine mold-growing conditions. Without a guarantee, the Douglases elected to take no action.

In July 2008, the pay-in-full date was quickly approaching. Because it was uninhabitable, they requested an additional month to investigate the extent of the mold. The promissory note's due date was pushed back to September 1.

In the meantime, the Douglases removed the bellyband. They discovered substantial rot and pest issues underneath. In fact, there was virtually nothing behind the bellyband and they did not encounter any resistance in removing the boards. The Douglases defaulted on the promissory note.

In September 2008, Flaherty returned to the house a third time. He determined that the rim joists had 50 percent to 70 percent wet rot and pest damage that could not be seen from the crawl space without removing insulation. Similarly, he concluded the

3

sill plate had 50 percent to 70 percent wet rot and pest damage. He opined that "installation of the siding was within the last two years and the extent of damage to the sill and rim joist could not have occurred since the installation of the skirt boards siding. Therefore, whoever installed the skirt board siding would have known that structurally damaged portions of the framing would have been concealed." He further stated, "It is my professional opinion that the installation of the pink fiberglass insulation in the crawl space stud bays between the floor joists and firmly packed against the rim joists may have been installed to reduce the probability that damaged rim joists and sill would be discovered during a standard home inspection."

Another inspector, Kirk Juneau, also inspected the damage. He determined that a new trim was used on the house's exterior that is only intended for interior use. The trim covered and concealed damage, and had been installed within the previous two to three years. In the house's interior, he noted that where subflooring had been replaced the person who made the patches should have discovered the damage beneath. Beneath the house, he determined that some joist damage was visible, because it was not covered by insulation, and that once insulation was removed more damage was visible.

The Douglases shut off the water, drained the lines, and turned off the electricity. They obtained a bid from a contractor who determined it would cost more to repair the home than to tear it down and rebuild.

The Douglases sued the Vissers. They claimed fraudulent concealment, negligent misrepresentation, violation of the Consumer Protection Act, ch. 19.86 RCW, breach of contract, and violation of Terry Visser's statutory duties as a real estate agent.

4

Kelly Hatch, who assisted Visser with some of the repairs, testified that he had difficulty fixing the floors in the bathroom, because the wood was too soft to install screws. When he advised Terry Visser to rip out the plywood to inspect the joists underneath, Visser said he could not put any more into it and told Hatch to find a way to attach the wood. On the house's exterior, Hatch discovered that wood underneath the bellyband was rotted. Visser instructed him to cover it up with trim. Specifically, Visser said they could cover it in caulking, use a bunch of nails, paint it, and seal it. When Hatch nailed the trim up, it was so rotted that he could not get the nails to stay in. Visser himself testified that he added a new piece of wood to a rotted joist, although he asserted he could not see the rot.

Flaherty explained that the rot he discovered in the first inspection was "[n]ot necessarily" a sign that the building's whole sill plate was rotted. He testified that the concealed rot he discovered in his last inspection was the worst he had ever seen. Juneau testified that at the time of the Douglases' purchase there was readily observable damage that warranted further inspection or inquiries.

The trial court found that the Vissers discovered significant wood rot to the sill plate and rim joist, as well as to the floor joists. It determined that, instead of correcting the defects, the Vissers made superficial repairs and concealed the damage. It ruled in favor of the Douglases on all claims. The court awarded the Douglases $103,000 to tear down and rebuild the house, $3,000 to cover the cost of inspections, $1,500 in moving expenses, $12,000 for emotional distress, and $25,000 as treble damages pursuant to the Consumer Protection Act. It also awarded the Douglases their fees and costs in the amount of $49,838. It offset those damages against the principal and

5

interest the Douglases still owed on the promissory note. Judgment was entered for the Douglases in the amount of $24,245.

## DISCUSSION

When the trial court enters findings of fact and conclusions of law, review is limited to determining if the findings of fact are supported by substantial evidence and if the findings of fact support the conclusions of law. Panorama Vill. Homeowners Ass'n v. Golden Rule Roofing, Inc., 102 Wn. App. 422, 425, 10 P.3d 417 (2000). Substantial evidence is evidence sufficient to persuade a fair-minded, rational person of the declared premise. Hegwine v. Longview Fibre Co., 132 Wn. App. 546, 555-56, 132 P.2d 789 (2006), aff'd, 162 Wn.2d 340, 172 P.3d 688 (2007).

The Vissers challenge several of the trial court's findings that are central to its conclusions. Specifically, they argue that there is no substantial evidence to support findings that the Vissers discovered and concealed defects before selling the home, or a finding that the defects were unknown and undiscoverable to the Douglases.

The trial court found:

During the course of renovating the house, the Vissers discovered significant wood rot to the sill plate and rim joist that connects the concrete foundation to the frame.

It further found:

Rather than correct these defects, the Vissers or their hired help made superficial repairs to the visible damage and covered up the rest.

Two inspectors independently concluded that extensive damage was covered up during the period of time that the Vissers owned the house. Flaherty determined that the damage could not have occurred after the repair work, and Juneau determined that

6

damage beneath the flooring should have been discovered when the subflooring was repaired. Hatch corroborated the inspectors' reports. He testified that he and Terry Visser covered rot with new trim and new subflooring. The inspection reports, together with Hatch's testimony, amply support the trial court's findings that the Vissers discovered and concealed rot.

The trial court also found:

> The defects were unknown to the Douglases and were not discoverable by a careful and reasonable inspection.

When a buyer is on notice of a defect, it must make further inquiries of the seller. In Puget Sound Serv. Corp. v. Dalarna Mgmt. Corp., an apartment building had chronic water leaks. 51 Wn. App. 209, 210, 752 P.2d 1353 (1988). Despite the owner's repeated attempts to fix the leaks, the problem persisted. Id. at 210-11. Eventually, the owner decided to sell the building. Id. at 211. The seller had several conversations with the buyer, but never talked about defects or maintenance problems. Id. The buyer's prepurchase inspection revealed evidence of water penetration including stains, cracked plaster, and loose tiles. Id. In other words, evidence of water leaks was readily observable. Id. Nevertheless, the buyer purchased the building without making further inquiries and later sued alleging that the seller failed to disclose "'substantial, chronic, and unresolved water leakage problems.'" Id. at 212.

The buyer agreed that it discovered evidence of water leaks, but argued that the true problem was the extreme, chronic nature of the leaks. Id. at 214. It characterized the extent of the problem as a separate defect. Id. We concluded that where "an actual inspection demonstrates some evidence of water penetration, the buyer must make

7

inquiries of the seller." Id. at 215. The buyer knew there was a defect, but did not make any inquiries or establish that inquiries would have been fruitless. Id. The extent of the damage itself was not a separate defect, and it was no defense that the defect was worse than the buyer anticipated. Id. at 214-15. Accordingly, its claim could not proceed. Id. at 215.

In contrast, in Sloan v. Thompson the buyers had extensive knowledge of various defects. 128 Wn. App. 776, 781, 115 P.3d 1009 (2005). Before they purchased it, the Sloans rented the home for three years and discovered that the roof leaked, the decks were rotted, some electrical outlets did not work, and the toilets did not flush properly. Id. at 781. After the sale was completed, an earthquake revealed that the septic tank was defective and the foundation was structurally unsound due to "'extremely faulty construction.'" Id. at 782, 786. Because the defective septic tank and structurally unsound foundation were separate defects from the extensive problems the buyers knew of, the buyers succeeded on their claim for fraudulent concealment. Id. at 789, 791.

Here, Flaherty identified an area of rot and decay near the roofline, an area of rotted sill plate, and sistered floor joists. The Douglases and their inspector were on notice of the defect and had a duty to make further inquiries. The Douglases argue that "they had no idea that 50 to 70% of the sill plate and rim joist were destroyed" and that the area of rot that Flaherty discovered was not unusual. That, however, is the precise argument we rejected in Dalarna. Once a buyer discovers evidence of a defect, they are on notice and have a duty to make further inquiries. They cannot succeed when the extent of the defect is greater than anticipated, even when it is magnitudes greater.

8

The Douglases suggest, without citation to the record, that they did in fact make further inquiries, asserting that "[n]either a reasonable inspection,[1] nor the Douglases' reasonable questions, put them on notice" of the extent of damage. (Emphasis added.) But, Nigel Douglas explicitly testified that after the prepurchase inspection report, which was the source of notice of the defects, he did not ask the Vissers or Flaherty any questions about the rot that Flaherty identified. Instead, they were content to let the report speak for itself.

Prior to the inspection, the Douglases asked follow-up questions to the Vissers' perplexing responses in the seller disclosure statement. But none of those questions expressly addressed the rot issue, and the Douglases did not ask any specific questions about rot or the house's foundation. More significantly, both the seller disclosure statement and the Vissers' responses to the Douglases' inquiries predate the prepurchase inspection report. Inquiries made before the prepurchase inspection cannot be construed as inquiries regarding the rot discovered during the inspection.

As in Dalarna, there is no evidence that the Douglases made further inquiries once they were on notice of the defect. Dalarna recognizes that further inquiry is not necessary where it would have been fruitless. 51 Wn. App. at 215. While the Vissers'

---

[1] When Juneau inspected the home in September 2008, he discovered an exposed girder beam with extensive carpenter ant damage. He also observed exposed sistered joists that were essentially worthless, because they did not reach the girder beam. Juneau testified that the damaged girder beam together with the sistered joists, all of which were visible without further intrusion, should have been cause for further inspection when Flaherty conducted his prepurchase inspection. In contrast, the only evidence that Flaherty conducted a reasonable inspection is Flaherty's own testimony that he conducted an inspection. We need not decide whether that constitutes substantial evidence to support a finding that he conducted a reasonable inspection, because the inspection did, in fact, provide notice of the defect.

overt attempts to cover up the defects prior to listing the property and their preinspection evasiveness may support an inference, if not a conclusion, that such inquiry would have been fruitless, the trial court did not enter any such findings. Accordingly, despite the egregious nondisclosure and concealment by the Vissers, an essential element of each of the Douglases' claims is not satisfied.[2]

A claim for fraudulent concealment exists when (1) the residential dwelling has a concealed defect, (2) the seller has knowledge of the defect, (3) the defect presents a danger to the property or health or life of the buyer, (4) the defect is unknown to the buyer, and (5) the defect would not be disclosed by a careful, reasonable inspection by the buyer. Alejandre v. Bull, 159 Wn.2d 674, 689, 153 P.3d 864 (2007). A statutory claim for breach of a real estate agent's duties exists when the agent does not disclose all material facts known to the agent that are not apparent or readily ascertainable. RCW 18.86.030(1)(d). A claim for negligent misrepresentation exists when the seller (1) makes a false statement, (2) to induce a business transaction, and (3) the buyer justifiably relies on the false statement. Amtruck Factors v. Int'l Forest Prods., 59 Wn. App. 8, 18, 795 P.2d 742 (1990). A violation of the Consumer Protection Act exists when there is (1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) with a public interest impact, (4) that proximately causes, (5) injury to a

---

[2] The Vissers also argue that the economic loss rule precludes recovery for negligent misrepresentation, that Terry Visser could not be held liable for representations made in his capacity as real estate agent, and that statements in the seller disclosure statement cannot be construed as a warranty. They further challenge the trial court's damages award. They argue that the Douglases did not mitigate damages, that the Douglases were not entitled to emotional distress damages, and that the trial court used an improper measure of damages. Because we reverse, we do not reach these issues.

10

plaintiff in his or her business or property. Svendsen v. Stock, 143 Wn.2d 546, 553, 23 P.3d 455 (2001); Indoor Billboard/Wash., Inc. v. Integra Telecom of Wash., Inc., 162 Wn.2d 59, 83-84, 170 P.3d 10 (2007).

Because the Douglases were on notice of the defect and had a duty to make further inquiry, it cannot be said that the defect was unknown to the Douglases, that it could not have been discovered by a reasonable inspection, that the Douglases justifiably relied on the Vissers' misrepresentations, or that the Vissers committed an unfair or deceptive act that caused the Douglases' injury.[3]

The Vissers efforts in concealing the defects of the house they were selling are reprehensible, even more so because Visser is a licensed real estate agent. Nonetheless, the law retains a duty on a buyer to beware, to inspect, and to question. We caution that the Douglases did not have a duty to perform exhaustive invasive inspection, or endlessly assail the Vissers with further questions. They merely had to make further inquiries after discovering rot or at trial show that further inquiry would have been fruitless. The only evidence of when the Douglases first learned of rot in the house is the report issued after Flaherty conducted his prepurchase inspection. Despite that discovery, on top of the Vissers' previous evasive and incomplete answers and the Vissers' on-going failure to provide their own prepurchase inspection report, either of which should have caused concern and further inquiry, there is no evidence that the Douglases made any inquiries whatsoever after the inspection. They obtained no

---

[3] The Douglases breach of contract claim was based upon fraudulent concealment and negligent misrepresentation claims. When those claims fail, so does the breach of contract claim.

finding from the trial court that further inquiry would have been fruitless. Under Dalarna, the Douglases' failure means they were not entitled to maintain these claims.

The Douglases defaulted on the promissory note. The interest rate in the event of default is 18 percent. The Douglases owe the principal and interest at 18 percent. Further, the purchase and sale agreement provides an attorney fee provision. When an action in tort is based on a contract containing an attorney fee provision, the prevailing party is entitled to attorney fees. Brown v. Johnson, 109 Wn. App. 56, 58, 34 P.3d 1233 (2001). We award the Vissers their reasonable attorney fees.

We reverse.

WE CONCUR: