# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| SHANE and AMY WATTS, | ) | NO. 68067-6-I |
| | ) | |
| Respondents, | ) | DIVISION ONE |
| | ) | |
| v. | ) | ORDER DENYING APPELLANTS' |
| | ) | MOTION FOR RECONSIDERATION |
| MARY P. DUNPHY and MARK L. | ) | AND/OR TO PUBLISH AND ORDER |
| DUNPHY, | ) | WITHDRAWING OPINION FILED |
| | ) | AUGUST 26, 2013 AND |
| Appellants. | ) | SUBSTITUTING AMENDED OPINION |

On August 26, 2013, this court filed its unpublished opinion in the above-entitled action. Appellants have moved for reconsideration and/or to publish the opinion. The panel has decided to deny the motion for reconsideration and/or to publish. The panel has also decided to withdraw the opinion filed August 26, 2013 and replace it with the amended opinion attached hereto.

IT IS HEREBY ORDERED that the appellants' motion for reconsideration and/or to publish is denied;

IT IS FURTHER ORDERED that the unpublished opinion of this court filed in the above-entitled action on August 26, 2013, be withdrawn and that the amended opinion be substituted in its place.

In all other respects, the appellant's motion to reconsider and/or to publish is denied.

DATED this 23rd day of December 2013.

FOR THE PANEL:

_____
Judge

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| SHANE and AMY WATTS, | ) | NO. 68067-6-I |
| | ) | |
| Respondents, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| MARY P. DUNPHY and MARK L. | ) | |
| DUNPHY, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellants. | ) | FILED: December 23, 2013 |
| | ) | |

LAU, J. — Generally, a home buyer's duty to inquire further of a seller about a home's defect arises upon notice of the defect. Mary Dunphy, an experienced real estate agent, sold her condominium unit to Shane Watts. Dunphy knew her unit's lack of weather resistant barrier (WRB) made it vulnerable to water leaks and damage. She intentionally lied about it on the form 17 disclosure statement.[1] As part of the sale documents, Watts reviewed homeowners' association Board meeting minutes that mentioned "inspections," "envelope studies," a "defect attorney," and other issues but made no mention of particular defects, Dunphy's unit, or any other individual unit. Watts

---

[1] The trial court found Dunphy "lied" about the defect.

discovered the defect after the sale closed and sued Dunphy. The trial court found Dunphy liable for fraudulent concealment and fraud. Because the meeting minutes triggered no duty flowing to Watts to inquire further under these circumstances, we affirm and award Watts attorney fees and costs under the purchase and sale agreement.

## FACTS

The trial court's factual findings are undisputed. In 2006, Mary Dunphy purchased a condominium unit at 13020 102nd Lane Northeast #3, in Kirkland, Washington. On July 27, 2006, Dunphy became vice president of the Kirkland Village Homeowners' Association (HOA).

In October 2006, Dunphy arranged for Darrel Hay to inspect the buildings in Kirkland Village. Hay checked three buildings and found that all three lacked tar paper or weather resistant barrier (WRB). Hay opined that the lack of WRB was problematic because it made the buildings vulnerable to water leaks and damage. He noted no specific damage. Hay gave his report to Dunphy, who read it.

Dunphy attended all HOA Board meetings—some of which were held in her home—through May 2007. In February 2007, the Board asked construction inspection firm Corke Amento Inc. (Corke) to prepare a presentation regarding Kirkland Village. During its February 2007 meeting, the Board heard Corke's presentation and discussed Hay's report.

Based on the information it received, the Board decided to further pursue its ongoing disputes with Kirkland Village's developer, Center Bay. The Board hired a new property manager, Suhrco Management, which recommended a thorough inspection of

the complex so that the Board could give Center Bay a list of problems that needed to be fixed. The lack of WRB was one of the issues to consider.

In March 2007, Corke prepared a "Scope of Limited Investigation" showing its plan for inspecting the complex. Among other things, the plan showed that Dunphy's unit would have its siding removed. The proposal was circulated among the Board members, and Dunphy read it.

In April 2007, the Board hired Corke to inspect the complex. This decision was discussed and approved by all Board members, including Dunphy. Lack of WRB was among the problems Corke was hired to investigate. The inspection began on May 1, 2007. Corke removed siding on the majority of the complex buildings, and 75 percent of the buildings either lacked WRB altogether or had incorrectly installed WRB. Removal of siding on Dunphy's unit revealed that it lacked WRB. Dunphy saw that her unit lacked WRB.

On May 4, 2007, Corke (including Corke's lead engineer Mark Cress and president Steven Amento), defects attorney David Onsager (hired by the Board to recommend legal action against Center Bay), Board president Craig Cleaver, and Dunphy met to walk through the Kirkland Village complex and view the buildings. Some portions of the buildings still had siding removed, so that the Board and its attorney could see what was underneath the siding. The walk through revealed that the majority of the buildings lacked WRB. Dunphy witnessed the lack of WRB. To summarize, Dunphy—as a member of the Board who participated in the walk through—was aware of significant material problems with the missing WRB under the siding on the buildings throughout the complex, including her own unit. Dunphy was also aware that Corke

-3-

would soon produce a written report that, when given to the Board, would have to be disclosed to potential buyers.

The next month (June 2007), Dunphy and her husband purchased a single family home in Juanita for $473,000. Dunphy needed cash to close the sale. The only way for her to close the sale and move was to sell her Kirkland Village unit at full market value. Buyer Shane Watts signed a purchase and sale agreement for Dunphy's unit, providing for attorney fees to the prevailing party in case of a dispute involving the agreement. As part of the agreement, Dunphy completed a seller's disclosure statement (form 17), as required under chapter 64.06 RCW. Around July 23, 2007, the parties agreed that Watts would purchase the unit for $273,000.

Watts hired a home inspector to inspect the unit. The inspector did not look under the siding or inspect any other buildings in the complex. The inspection did not reveal the missing WRB on Dunphy's unit or the problems with the buildings in the rest of the complex. The evidence was uncontroverted that a normal, routine home inspection of a condominium would not have revealed any of the problems in the complex or the missing WRB in Dunphy's unit. The trial court found that Watts did a reasonably diligent inspection of the property.

Dunphy filled out two form 17s on July 9 and 25.[2] In the July 25 form 17, in response to question 4(F), "Are there any defects with the following: . . . Siding . . . Interior Walls . . . Exterior Walls . . . Other", Dunphy answered, "No." This

---

[2] The trial court found that Watts had the right to rely on Dunphy's disclosures on form 17, that Dunphy had a duty to fill out form 17 completely and correctly, and that the July 25 form 17 controlled with respect to disclosures.

was a lie. Dunphy knew about the missing or incorrectly installed WRB in multiple buildings in the complex—including her own unit—but she represented that there were no defects in the siding or external and internal walls. No evidence indicated any defect in the siding itself, but a substantial question existed regarding whether the lack of vapor barrier or moisture barrier was a defect. Notices, studies, and oral reports well known to Dunphy indicated the moisture barrier did not exist and that future damage was likely if the problem went untreated.

Also in the July 25 form 17, in response to question 10(A) "Are there any other existing material defects affecting the property that a prospective buyer should know about?", Dunphy answered, "Don't know." This was also a lie. Dunphy was well aware of the Corke inspection and the problems pointed out during the May 2007 walk through. Dunphy's misstatements were intentional. Dunphy intended to mislead Watts to ensure the condominium sale closed for full price in a timely manner.[3]

Dunphy arranged for property manager Suhrco to produce a resale certificate and a series of required documents. These documents included a copy of the HOA Board's meeting minutes for the past 6 to 12 months.[4] Watts received the minutes and read them enough to comment on the parking situation. The minutes contain a list of the issues the Board addressed in its monthly meetings. Included among those issues

---

[3] As the trial court later found in granting partial summary judgment in Watts's favor, Dunphy also lied regarding whether any study, survey project, or notice existed that would adversely affect the property. We address the partial summary judgment order below.

[4] It is undisputed that the meeting minutes consist of 33 pages. Watts received 25 pages (through July 2007) covering numerous issues.

are mentions of inspections, envelope studies, Hay's report, and other items. The meeting minutes were admitted at trial as exhibit 3.

The October 16, 2006 meeting minutes mention "[c]oncerns about the moisture barrier under siding." Ex. 3 at 7. The December 12, 2006 meeting minutes state, "Vinyl siding is held off until the rain is more cooperative, so large portions can be pulled back to insure no damage underneath." Ex. 3 at 8.

The February 13, 2007 meeting minutes contain the following notations:

1. Envelop[e] Study was discussed by Mark Cress; an overview of the independent inspection report by Darrell Hays was commented by Mark.
2. Mark Cress presented his findings with photo of the property which included siding, moisture barrier.
3. Discussed options on how to proceed depending on what the POS states about envelop[e] study. Two options are proposed: 1. Intrusive Investigation or 2. Envelop[e] Study
4. Envelop[e] study was the recommendation
5. David Onsager (another attorney) at Stafford Frie Law Firm was mentioned as another option.
   . . . .

Ex. 3 at 11.

The March 13, 2007 meeting minutes include the notation, "Update on inspection. Deferred until next meeting, no response from Mark W. of Corke-Amento." Ex. 3 at 12. The minutes also note, "Inspection—find a second company." Ex. 3 at 14.

The April 10, 2007 meeting minutes include the notation, "Craig/Terry spoke to Corke Amento and we are moving ahead with the envelope/invasive inspection. Center [B]ay wanted to use their inspector, Craig declined that offer, but accepted the offer for Center [B]ay to pay 50% of the cost." Ex. 3 at 15.

The May 8, 2007 meeting minutes include the following notation:

2) Discussion of Intrusive Study
   a. Need David Onsager to weigh in on the moisture barrier and whether or not there is significant damage.
   b. Waiting for results from Corke Amento and David Onsager
   c. David Onsager will provide recommendation in the report
   d. Terry to call David's assistant in order to get the date the report will be ready

Ex. 3 at 17.

On June 12, 2007, the Kirkland Village HOA held its annual meeting for all unit owners. Ex. 3 at 19. The meeting minutes include the notation, "Discussed envelope study and possible assessments. Informed that we are working with Center [B]ay and trying to resolve issues and working on not going into a legal battle." Ex. 3 at 20. The minutes also contain the following notation:

IV. New Business (8:19–8:24)
   a. Inspection/Construction Defect
      i. Corke Amento performing inspection
         1. Currently waiting for report
      ii. Asked owners to inform board of any [] defects or issues
      iii. Timeline—depends on cooperation of builder

Ex. 3 at 20.

The July 12, 2007 meeting minutes include the following notation:

Bill from Corke Amento, inspectors for Envelope inspection came in at $9350.03
We are holding Center Bay to their offer to pay for half of this inspection.
David Ansager defect Attorney has billed us 1792.00 for 5.6 hours of work.
Missing insulation is an issue the Board will be going after Center Bay for.

Ex. 3 at 23.

After the sale closed,[5] Watts discovered the condominium's lack of WRB. Watts sued Dunphy for damages in February 2010, alleging breach of warranties, negligent

_____

[5] Although the trial court made no findings on this issue, the bench trial testimony indicates that the sale closed on August 20, 2007. The testimony also indicates that the

misrepresentation, intentional misrepresentation, and breach of duty of good faith. Watts amended his complaint in July 2010, voluntarily dismissing the negligent misrepresentation claim but adding claims for breach of contract, fraudulent concealment, and fraud.

The HOA sued Center Bay, and that lawsuit settled for a little over a million dollars. The HOA also has a bankruptcy court claim against Center Bay's owner that was pending at the time Watts and Dunphy went to trial. The HOA has collected approximately $1.3 million. At the time of trial, no repairs had begun and no plan existed for when repairs would start. Some testimony addressed the repair cost, but "there was no definite plan on what would be done; how much it would cost." The court found the future possible repairs too speculative to use in determining the effect on the current value of Watts's unit. The court found that the "current value of the unit, by clear, cogent, and convincing evidence, is $132,000." The court also found that without damage, "the condominium would have been worth a minimum of $170,000," meaning damages were $38,000.

In December 2010, Watts moved for partial summary judgment, requesting the court to find that Dunphy committed fraudulent concealment and fraud in selling the condominium to Watts.[6] In February 2011, the court granted in part Watts's motion

---

HOA Board did not receive Corke's final report regarding the missing or defective WRB until September 2007.

[6] Regarding fraudulent concealment, Watts argued that (1) the condominium had a concealed defect, (2) Dunphy knew about the defect, (3) the defect presented a danger to the purchaser's property, health or life, (4) the defect was unknown to the purchaser, and (5) the defect would not be disclosed by a careful, reasonable inspection by the purchaser. Regarding fraud, Watts claimed that (1) Dunphy represented that

for partial summary judgment in making the following finding of fact: "1. The court finds that when on the Form 17 dated July 25, 2007, Mary Dunphy answered Question No 1.(G), 'Is there any study, survey project, or notice that would adversely affect the property,' as 'Don't know,' this was a false statement."[7]

During the bench trial, Dunphy argued that the meeting minutes put Watts on inquiry notice of the condominium's lack of WRB, thus triggering Watts's duty to inquire further. The court disagreed and found Dunphy liable for fraudulent concealment and fraud. In its conclusions of law, ¶ 3.4(5), the court stated:

> Additionally, [Dunphy's] argument is that the HOA meeting minutes in and of themselves [were] sufficient to put [Watts] on notice and that they had no right to rely on the Form 17 representations and their own Homeowner's inspection report.
> But if the Watts had read the [HOA] meeting minutes, what would it have told them? Although the words "defect," "envelope studies," "Investigation," and "defect attorney" were mentioned several times, there is no context or explanation for the brief references buried in a maze of other irrelevant information. Only with the use of 20/20 hindsight and specialized knowledge can we pick out the significance of these words.
> The court does not find persuasive the argument that meeting minutes alone are sufficient to give Mary Dunphy the same level of knowledge that we are imputing to the Watts. Although the Watts had the minutes, Ms. Dunphy not only had the minutes for her review, but actually attended all the HOA meetings, except for possibly the June meeting. She was also the Vice President of the Board, and therefore had the opportunity and could reasonably understand what was in those Minutes. She actually lived through them. She experienced it. She was there, and she was present for at least part of the walk through inspection in May 2007. She was aware that the complex did not have a vapor or water

---

there were no defects, among other material facts, (2) the defects were material, (3) Dunphy's answers were false, (4) Dunphy knew her answers were false, (5) Dunphy intended Watts to rely on her false answers, (6) Watts did not know Dunphy's answers were false, (7) Watts relied on the false answers, (8) Watts had a right to so rely, and (9) Watts suffered severe damages.

[7] Dunphy does not appeal the trial court's grant of partial summary judgment, and she agrees on appeal that she lied on the form 17.

resistant barrier; and was aware that the engineer and a defect attorney was present on the walk through.

Much has been made of the fact that the engineer only made factual comments and did not offer any conclusions. But that is beside the point. Mary Dunphy knew that a defect attorney and an engineer were looking at several issues in the complex, including the lack of a vapor resistant barrier; and that part of the reason that Ms. Dunphy knew the investigation was going on, was to go [to] the developer and seek to have the developer pay for any cost required to fix the problem. Ms. Dunphy also knew the report would be completed soon, and once the report was done it would have to be disclosed.

The court entered judgment against Dunphy and awarded Watts $38,000 in damages and over $55,000 in attorney fees and costs. Dunphy appeals.

## ANALYSIS

### Standard of Review

Following a bench trial, we review factual findings for substantial evidence and legal conclusions de novo, determining whether the findings support the conclusions.[8] Sunnyside Valley Irrigation Dist. v. Dickie, 149 Wn.2d 873, 880, 73 P.3d 369 (2003).

The standard of review for a trial court's findings of fact and conclusions of law is a two-step process. First, we must determine if the trial court's findings of fact were supported by substantial evidence in the record. If so, we must next decide whether those findings of fact support the trial court's conclusions of law.

Landmark Dev., Inc. v. City of Roy, 138 Wn.2d 561, 573, 980 P.2d 1234 (1999). If the trial court mislabels a factual finding or legal conclusion, we consider it for what it really is. Willener v. Sweeting, 107 Wn.2d 388, 394, 730 P.2d 45 (1986). "Substantial evidence is evidence sufficient to persuade a fair-minded, rational person of the declared premise." Douglas v. Visser, 173 Wn. App. 823, 829, 295 P.3d 800 (2013). In

---

[8] Dunphy's reliance on Speelman v. Bellingham/Whatcom County Housing Authorities, 167 Wn. App. 624, 273 P.3d 1035 (2012), is misplaced. Speelman involves due process notice requirements. Dunphy also relies on inapplicable bona fide purchaser case authority.

determining the sufficiency of evidence, an appellate court need only consider evidence favorable to the prevailing party. Bland v. Mentor, 63 Wn.2d 150, 155, 385 P.2d 727 (1963). We defer to the trial court's assessment of witness credibility and evidence weight. In re Welfare of Sego, 82 Wn.2d 736, 739-40, 513 P.2d 831 (1973). Unchallenged findings of facts are verities on appeal. Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 808, 828 P.2d 549 (1992).

Fraudulent Concealment

On a claim for fraudulent concealment, the seller's duty to speak arises

where (1) the residential dwelling has a concealed defect; (2) the vendor has knowledge of the defect; (3) the defect presents a danger to the property, health, or life of the purchaser; (4) the defect is unknown to the purchaser; and (5) the defect would not be disclosed by a careful, reasonable inspection by the purchaser.

Alejandre v. Bull, 159 Wn.2d 674, 689, 153 P.3d 864 (2007). Failure to disclose a material fact where there is a duty to disclose is fraudulent. Stieneke v. Russi, 145 Wn. App. 544, 560, 190 P.3d 60 (2008). The plaintiff must establish each element of fraudulent concealment by clear, cogent, and convincing evidence. Stieneke, 145 Wn. App. at 561.

The parties dispute the fourth requirement—that the defect is unknown to the buyer. Dunphy contends certain HOA Board meeting minute excerpts triggered Watts's duty to inquire about the condominium's latent WRB defects. Watts responds that the meeting minutes' intermittent mention of inspections and defects "buried in a sea of other problems" is insufficient to trigger a duty to inquire. Resp't's Br. at 16 (capitalization omitted). Watts also contends that these minutes provided no specific notice about a specific problem to their specific condominium unit.

-11-

Our Supreme Court discussed a buyer's duty to inquire further in the fraudulent concealment context:

> Although a fraudulent concealment claim may exist even though the purchaser makes no inquiries which would lead him to ascertain the concealed defect, in those situations where a purchaser discovers evidence of a defect, the purchaser is obligated to inquire further. Simply stated, fraudulent concealment does not extend to those situations where the defect is apparent.

Atherton Condo. Apartment-Owners Ass'n Bd. of Directors v. Blume Dev. Co., 115 Wn.2d 506, 525, 799 P.2d 250 (1990) (citations omitted); see also Douglas, 173 Wn. App. at 830 ("When a buyer is on notice of a defect, it must make further inquiries of the seller"); Puget Sound Serv. Corp. v. Dalarna Mgmt. Corp., 51 Wn. App. 209, 214-15, 752 P.2d 1353 (1988) (same; if the buyer fails to inquire, he cannot later argue that he knew nothing about the extent of the problem).

Dunphy claims, "This is one of those rare appeals that can be decided entirely on the basis of a single recent Supreme Court case, Alejandre v. Bull, 159 Wn.2d 674, 153 P.3d 864 (2007)."[9] Appellant's Br. at 14. Dunphy argues that under Alejandre, the meeting minutes constitute constructive notice of the condominium defect. Watts responds that any "notice" contained in the meeting minutes is factually distinguishable from the notice in Alejandre.

In Alejandre, defendant Mary Bull owned a single family residence that was served by a septic system. Alejandre, 159 Wn.2d at 678. The year before she put the house up for sale, she noticed soggy ground over the septic system. Alejandre, 159 Wn.2d at 678. She hired William Duncan of Gary's Septic Tank Service to pump the septic tank and also hired Walt Johnson Septic Service to empty the tank and repair a

---

[9] Dunphy's opening brief relies exclusively on Alejandre.

broken pipe leading from the tank to the drain field. Alejandre, 159 Wn.2d at 678. Bull also applied for a connection to the city sewer, but abandoned the idea after learning she would have to pay a $5,000 hook-up fee. Alejandre, 159 Wn.2d at 678.

Bull placed her home on the market in June 2000. Alejandre, 159 Wn.2d at 678. In September 2001, Bull and Arturo and Norma Alejandre entered into an agreement for the sale of Bull's home to the Alejandres. Alejandre, 159 Wn.2d at 678. The agreement required Bull to pump the septic tank before closing and conditioned the sale on a septic system inspection. Alejandre, 159 Wn.2d at 678.

As provided for in the agreement, Walt's Septic Tank Service pumped the tank and sent the Alejandres a copy of the bill. Alejandre, 159 Wn.2d at 679. The bill stated, "[T]he septic system's back baffle could not be inspected but there was '[n]o obvious malfunction of the system at time of work done." Alejandre, 159 Wn.2d at 679 (second alteration in original) (quoting Ex. 6). Bull gave the Alejandres a seller's disclosure statement indicating that the house had a septic tank system that was last pumped and inspected in fall 2000 and that "'Walt Johnson Jr. replaced broken line between house and septic tank . . . .'" Alejandre, 159 Wn.2d at 679 (quoting Exhibit 5). Bull answered "no" to the inquiry whether there were any defects in the septic system's operation. Alejandre, 159 Wn.2d at 679.

A month after the sale closed, the Alejandres smelled an odor inside the home and heard water gurgling. Alejandre, 159 Wn.2d at 680. They also noticed a foul odor outside the home and believed it came from the ground around the septic tank, which they said was soggy. Alejandre, 159 Wn.2d at 680. By chance, they hired William Duncan of Gary's Septic Tank Service—the same person who pumped the system for

Bull in 2000. Alejandre, 159 Wn.2d at 680. Duncan told the Alejandres that he could pump the tank, but he could not fix the underlying problem because the drain fields were not working. Alejandre, 159 Wn.2d at 680. He also informed them that he previously told Bull that the drain fields were not working and that she should connect to the city's sewer system. Alejandre, 159 Wn.2d at 680.

The Alejandres hired another company to connect to the city sewer system. Alejandre, 159 Wn.2d at 680. During this work, the company found that the baffle to the outlet side of the septic system was missing, thus allowing sludge from the septic tank to enter and plug the drain field. Alejandre, 159 Wn.2d at 680.

The Alejandres sued Bull for fraud and misrepresentation, claiming costs and damages totaling nearly $30,000. Alejandre, 159 Wn.2d at 680. After they rested their case, Bull moved for judgment as a matter of law. Alejandre, 159 Wn.2d at 680. The trial court granted the motion, ruling that the economic loss rule barred the Alejandres' claims and that they failed to present sufficient evidence supporting their claims. Alejandre, 159 Wn.2d at 680. We reversed, holding that the Alejandres presented sufficient evidence to warrant the jury's consideration. Alejandre, 159 Wn.2d at 680-81.

Our Supreme Court reversed. Although Alejandre is better known for its economic loss rule discussion—which is not relevant here—the court also affirmed the trial court's decision to dismiss the Alejandres' fraudulent concealment and fraud claims. Regarding fraudulent concealment, the issue in Alejandre concerned element five— whether the buyers had shown that the defect in the septic system would not have been discovered through a reasonably diligent inspection. Alejandre, 159 Wn.2d at 689-90. Our Supreme Court concluded they had not met their burden:

-14-

The Alejandres failed to meet their burden of showing that the defect in the septic system would not have been discovered through a reasonably diligent inspection. In fact, the Alejandres accepted the septic system even though the inspection report from Walt's Septic Tank Service disclosed, on its face, that the inspection was incomplete because the back baffle had not been inspected. The testimony at trial showed that this part of the septic system was relatively shallow and easily accessible for inspection. A careful examination would have led to discovery of the defective baffle and to further investigation.

Alejandre, 159 Wn.2d at 689-90.

Alejandre is not controlling based on the facts of this case.[10] Our Supreme Court faulted the buyers for failing to conduct a reasonably diligent prepurchase inspection of their home's septic system in the face of an obvious, incomplete inspection report that revealed no inspection of the back baffle. As the court observed, a reasonably diligent and careful inspection of the septic system would have revealed the defective baffle that was easily accessible for inspection.

The present case involves no dispute over whether Watts undertook a reasonably diligent prepurchase inspection of their condominium unit. Watts hired a home inspector to conduct a prepurchase inspection of the condominium unit. That

---

[10] From the opinion, it appears the Alejandres did not hire their own home inspector or septic system inspector. Instead, they relied on the report prepared by the seller's septic tank service provider as well as a property inspection report—required by the lending bank—that indicated the septic system "'Performs Intended Function'" and stated that "'everything drains OK.'" Alejandre, 159 Wn.2d at 680. The earnest money agreement required the seller to pump the tank before closing.

As provided in the earnest money agreement, a septic tank service (Walt's Septic Tank Service) pumped the tank, and the Alejandres received a copy of the bill. The bill stated on it that the septic system's back baffle could not be inspected but there was "[n]o obvious malfunction of the system at time of work done." Alejandre, 159 Wn.2d at 679. (quoting Ex. 6). As noted above, Watts hired and relied on their home inspector's report as to the condition of their condominium unit.

inspection revealed nothing to indicate the condominium's lack of WRB such as exterior water damage. The court's unchallenged findings state:

> The Watts had a home inspection done by a home inspector. The inspection did not look under the siding, or inspect the rest of the complex. The inspection did not disclose any of the missing WRB on the Dunphy unit, or the missing [WRB] or the problems with the buildings in the rest of the complex. The evidence was uncontroverted that a normal, routine home inspection of a condominium would not have uncovered any of the problems in the complex or the missing WRB in the Dunphy unit. The court finds the Watts did a reasonably diligent inspection of the property.

Unlike the present case, the buyers in Alejandre had prepurchase notice of an incomplete inspection. They relied on an obvious, incomplete septic system report that revealed the back baffle had not been inspected.

Also, the Alejandres' prepurchase notice about the incomplete inspection involved the specific property they purchased. In the present case, Dunphy relies exclusively on 33 pages[11] of meeting minutes to argue that Watts should have inquired further after reviewing the minutes. To make this point, Dunphy relies on seven select meeting minute excerpts quoted above. Even when viewed in complete context, no mention or reference to WRB problems associated with Watts's condominium unit appears in any of the meeting minutes. And there is no information identifying which of the 64 units or 12 buildings are affected by the WRB problem.[12]

---

[11] We question whether Watts received the monthly meeting minutes from August to December 2007 because the record shows they received the meeting minutes at the end of July 2007, when they purchased the unit.

[12] The undisputed facts show the Kirkland Village Condominiums complex consists of 12 buildings with each building comprised of 3 to 7 individual townhome style units. Watts's unit is one of 7 in the 13020 building. Most of the units, including Watts's, are two stories high. A trial court is not required to make findings on stipulated or undisputed matters. Swanson v. May, 40 Wn. App. 148, 158, 697 P.2d 1013 (1985).

It is true the meeting minute excerpts mention "inspection," "envelope inspection," "invasive inspection," "moisture barrier," "intrusive study," "report," and "defect." According to Dunphy, this notice triggered Watts's duty to inquire about the WRB problem. The court's unchallenged finding of fact states:

> The Minutes contain a list of all the issues the Board dealt with. In there, among the other issues, are mentions of inspections; envelope studies, Darrel Hay's report, etc. The court looks at the minutes in the context of what the Watts knew at the time, not with the 20/20 hindsight at the time of trial. . . .

The court also made the following finding of fact which it mistakenly labeled as a conclusion of law:[13]

> But if the Watts had read the [HOA] meeting minutes, what would it have told them? Although the words "defect," "envelope studies," ["]Investigation," and "defect attorney" were mentioned several times, there is no context or explanation for the brief references buried in a maze of other irrelevant information.

Substantial evidence supports this finding of fact. The meeting minutes provide no details or explanation about the nature and extent of the WRB defect and specific units affected. Review of the trial evidence and meeting minutes establish substantial evidence to support the trial court's finding that the disputed meeting minute "words" were "brief references buried in a maze of other irrelevant information." For example,

---

[13] This finding appears under the heading "conclusions of law" in the written findings of fact and conclusions of law. It is well settled that the labels used by the trial court to distinguish findings versus conclusions are not controlling. We will consider legal conclusions and factual findings for what they are even though they may be mislabeled as a finding or a conclusion. Kane v. Klos, 50 Wn.2d 778, 788, 314 P.2d 672 (1957) (findings of fact are not made such by label or by commingling conclusions of law with findings of fact); Willener v. Sweeting, 107 Wn.2d 388, 394, 730 P.2d 45 (1986) (if the trial court mislabels a finding or legal conclusion, we consider it for what it really is). Here, the trial court commingled its factual findings and conclusions of law. But we treat them for what they are. Dunphy assigns error to this factual finding as an erroneous "conclusion of law."

HOA president Craig Cleaver described the October 16, 2006 meeting minutes as a "laundry list" of issues affecting the condominium complex, including homeowners complaining about several things, especially parking and landscaping. The record evidence shows the HOA Board sought to gather information on all complaints and issues about the condominium complex in order to submit them to the developer for redress. The WRB problem was merely one item in the developer "laundry list" during the condominium's conversion from developer owner to a homeowners association structure. As Watts points out, these were simply "'bullet points' in a long list of 'bullet points,'" none of which specifically related to Dunphy's unit or any other unit. Resp't's Br. at 17. We conclude substantial evidence supports the trial court's findings of fact and the findings support its conclusion of law that no duty to inquire further flowed to Watts based solely on review of the HOA Board meeting minutes.

Dunphy also relies on other cases to support her duty to inquire claim. None of those cases control for the reasons discussed above. Those cases involve buyers with prepurchase notice of a particular obvious defect affecting the specific property purchased. In Douglas,[14] the buyers' inspector identified an area of rot and decay near the roof line and caulking suggestive of a prior roof leak. He found an area of rotted sill plate below the section of water-damaged exterior siding. A portion of sill adjacent to the rotted section had recently been replaced and floor joists near the rotted area had been sistered. Douglas, 173 Wn. App. at 831-32. The buyers argued that the area of rot their inspector discovered was not unusual and they had no knowledge that 50 to 70 percent of the sill plate and rim joist were destroyed. We rejected that argument. Citing

---

[14] We decided Douglas after the close of appellate briefing.

Dalarna, we stated the well-settled rule that "[w]hen a buyer is on notice of a defect, it must make further inquiries of the seller." Douglas, 173 Wn. App. at 830. We reasoned:

> The Douglases and their inspector were on notice of the defect and had a duty to make further inquiries. The Douglases argue that "they had no idea that 50 to 70% of the sill plate and rim joist were destroyed" and that the area of rot [their inspector] discovered was not unusual. That, however, is the precise argument we rejected in Dalarna. Once a buyer discovers evidence of a defect, they are on notice and have a duty to make further inquiries. They cannot succeed when the extent of the defect is greater than anticipated, even when it is magnitudes greater.

Douglas, 173 Wn. App. at 832.

We also noted that additional facts should have prompted the Douglases to inquire further:

> Despite [the discovery of rot], on top of the Vissers' previous evasive and incomplete answers and the Vissers' on-going failure to provide their own prepurchase inspection report, either of which should have caused concern and further inquiry, there is no evidence that the Douglases made any inquiries whatsoever after the inspection.

Douglas, 173 Wn. App. at 834 (emphasis added).

In Dalarna, a buyer purchased an apartment building and later sued the seller for fraudulent concealment after discovering substantial water leakage problems. The buyer's inspector noted water stains and loose tiles. Despite this prepurchase notice of a water leak, the buyer closed on the sale. The buyer later discovered the water damage was more extensive. The buyer claimed that the seller concealed the extensive nature of the leak. Dalarna, 51 Wn. App. at 211-12. We held that due to the buyer's prepurchase knowledge of the water leak, its severity was readily ascertainable through further inquiries. Dalarna, 51 Wn. App. at 215.

In Jackowski v. Borchelt, 151 Wn. App. 1, 209 P.3d 514 (2009), the buyers purchased a waterfront home and later sued the sellers for fraud and fraudulent concealment when soil instability caused the house to slide.  Before the sale, the sellers gave the buyers a form 17 disclosure statement that contained language referring the buyers to a Mason County Department of Community Development letter.  Jackowski, 151 Wn. App. at 8.  The letter indicated that the "'following critical areas are present on this property:  . . . Landslide Hazard Areas.'"  Jackowski, 151 Wn. App. at 8.  The letter also referenced an existing geotechnical report conducted by a geologist.  Jackowski, 151 Wn. App. at 8.  The sellers faxed a copy of the letter to their real estate agent.  Jackowski, 151 Wn. App. at 8.  The fax included an addendum, provided by the geologist, that again referenced the geotechnical report.  Jackowski, 151 Wn. App. at 8.  The sellers' real estate agent then faxed the letter and addendum to the buyers' agent.  Jackowski, 151 Wn. App. at 8.  The buyers received and read the letter and addendum.  Jackowski, 151 Wn. App. at 8.  An addendum to the real estate purchase and sale agreement provided that the sale was contingent on the buyers' inspection—including, at the buyers' option, a soils/stability inspection.  Jackowski, 151 Wn. App. at 8.  The buyers conducted no soil stability investigation before the sale closed.  Jackowski, 151 Wn. App. at 8.

Jackowski addressed two issues relevant here—whether a reasonable inspection would have disclosed the landslide risk (fraudulent concealment claim) and whether the buyers established they had a right to rely on the sellers' fraudulent representations (fraud claim).  Jackowski, 151 Wn. App. at 17.  The court affirmed summary judgment dismissal of those claims:

Here, as we discussed above, the Jackowskis had prepurchase knowledge of the landslide hazard area and, thus, reliance on the Form 17 disclosure could not be reasonable. A reasonable inspection would have disclosed the landslide risk. The Jackowskis acknowledge that they had read the letter indicating that the property that they were contracting to buy was in a landslide hazard area. Tim Jackowski read documents before closing that referenced an existing geotechnical report. Tim Jackowski acknowledged that he made the sale contingent on his ability to hire professionals to conduct property inspections including soil and slope stability. Nevertheless, he failed to utilize the contingency to request such inspections. The trial court did not err by granting summary judgment on the Jackowskis' fraudulent concealment claims based on the landslide risk.

Jackowski, 151 Wn. App. at 17-18 (emphasis added).

Douglas, Dalarna, and Jackowski stand for the unremarkable proposition that a buyer's failure to inquire further after prepurchase notice of a specific defect involving the specific property purchased defeats a fraudulent concealment claim. These cases are not controlling. The undisputed facts and reasonable factual inferences support the conclusion that the meeting minutes triggered no duty flowing to Watts to make further inquiry.

Fraud

To succeed on a fraud claim, the plaintiff must establish by clear, cogent, and convincing evidence all nine elements of fraud:

(1) representation of an existing fact; (2) materiality; (3) falsity; (4) the speaker's knowledge of its falsity; (5) intent of the speaker that it should be acted upon by the plaintiff; (6) plaintiff's ignorance of its falsity; (7) plaintiff's reliance on the truth of the representation; (8) plaintiff's right to rely upon it; and (9) damages suffered by the plaintiff.

Stiley v. Block, 130 Wn.2d 486, 505, 925 P.2d 194 (1996). The sole issue on appeal is element 8—whether Watts had a right to rely on Dunphy's form 17 disclosures.

As our Supreme Court noted in <u>Williams v. Joslin</u>, 65 Wn.2d 696, 698, 399 P.2d 308 (1965), "'The right to rely on representations is inseparably connected with the correlative problem of the duty of a representee to use diligence in respect of representations made to him.'" (Quoting <u>Puget Sound Nat'l Bank v. McMahon</u>, 53 Wn.2d 51, 54, 330 P.2d 559 (1958)). A buyer who is on notice of a defect and has a duty to make further inquiry cannot justifiably rely on the seller's misrepresentations. <u>Douglas</u>, 173 Wn. App. at 834; <u>see also</u> <u>Alejandre</u>, 159 Wn.2d at 690 ("Having failed to exercise the diligence required, [the Alejandres] were unable to present sufficient evidence of a right to rely on the allegedly fraudulent representations.").

Dunphy's sole argument on appeal is that Watts failed to show he had a right to rely on Dunphy's representations because "[t]he Watts' right to rely on any representations made to them was tied to their diligence concerning the information they had."[15] Appellant's Br. at 20. As discussed above, the meeting minutes were insufficient to put Watts on inquiry notice of the latent defect. Watts had no duty to inquire further, and his reliance on Dunphy's form 17—a required disclosure form under chapter 64.06 RCW —was not unreasonable. Substantial evidence supports the trial court's findings and the findings support its conclusion that Dunphy was liable for fraud.

<u>Attorney Fees</u>

Dunphy and Watts each request attorney fees on appeal as the prevailing party under the purchase and sale agreement. In Washington, parties may recover attorney fees if allowed by statute, contract, or some well-recognized principle of equity.

---

[15] Dunphy does not challenge the trial court's conclusion that Watts met the other eight elements of fraud.

Torgerson v. One Lincoln Tower, LLC, 166 Wn.2d 510, 525, 210 P.3d 318 (2009). Here, although no copy of the real estate purchase and sale agreement appears in the record on appeal, the parties agree—and the trial court found—that the purchase and sale agreement provides for an award of fees to the prevailing party in a dispute concerning the agreement. Because Watts is the prevailing party on appeal, he is entitled to attorney fees and costs conditioned on his compliance with RAP 18.1.

## CONCLUSION

For the reasons discussed above, we affirm and award reasonable attorney fees and costs to Watts as the prevailing party conditioned on compliance with RAP 18.1.[16]

WE CONCUR:

_Cox, J._

_Becker, J._

---

[16] In her reply brief, Dunphy moved to strike certain references to trial testimony in Watts's response brief. The motion is denied under RAP 17.4(d) ("A party may include in a brief only a motion which, if granted, would preclude hearing the case on the merits. . . ."). In any event, this court is able to decide which portions of the record to consider even without such a motion.