[No. 34139. Department Two. February 13, 1958.]

N. J. GILLILAND, *Respondent,* v. MOUNT VERNON HOTEL COMPANY, *Appellant.*[1]

[1]Reported in 321 P. (2d) 558.

*Montgomery, Montgomery & Purdue,* for appellant.

*Alfred McBee,* for respondent.

FOSTER, J.—While the judgment under appeal is on a promissory note, the issue for determination is the validity of a compromise and settlement of mutual claims and demands which appellant asserts to be void because of respondent's concealment. In multifarious variations, appellant assigns error upon the rejection of its five affirmative defenses to the note, which, however, distill into the three following questions:

1. Was the nondisclosure of the respondent that he was the owner of the note a fraud on appellant?

2. Did appellant prove that there was no consideration for the note?

3. Did appellant prove that the note was not due?

Appellant's main contention is that respondent's nondisclosure of his ownership of the note at the time of the execution of mutual releases was a fraud vitiating the releases. The trial court held that it was not, and we agree.

Appellant, a Washington corporation, owns the President hotel in Mount Vernon, which it leased, on May 1, 1950, to respondent[2] for twenty years at a monthly rental of one thousand dollars. Respondent also purchased the cocktail lounge furniture for twenty thousand dollars. The lease proved improvident and the operation unprofitable. Maltby-Thurston Hotels, Inc., then owned a majority interest in the appellant. Early in 1952, Maltby-Thurston Hotels, Inc., sold

---

[2]The original lease was to the respondent and one other, whose interest was subsequently purchased by the respondent.

a controlling interest in the appellant corporation to a group of Mount Vernon residents, but respondent continued as lessee of the hotel.

While the President hotel was the corporation's only asset, it had substantial liabilities. The hotel was encumbered by a mortgage of fifty thousand dollars to the Washington Mutual Savings Bank, payable at the rate of five hundred dollars a month, on which at the time of trial there was an unpaid balance of forty thousand five hundred dollars. Another note, to a different payee and in a smaller amount, and the note in question, dated April 16, 1951, for approximately thirteen thousand dollars given Maltby-Thurston Hotels, Inc., at all times appeared upon the appellant's balance sheet as liabilities.

By November 1, 1953, respondent was delinquent nine thousand dollars in rent, besides owing a substantial sum to trade creditors. On that day, appellant caused the sheriff to serve upon respondent a formal notice canceling the lease; however, as an accommodation, respondent agreed to temporarily manage the hotel for the appellant at a monthly salary of three hundred fifty dollars. Each party asserted substantial claims against the other, which they, in good faith, promptly undertook to settle.

The record is not clear as to which party first suggested settlement. However, the testimony of the secretary is at least suggestive that appellant was the prime mover.[3]

Both employed eminent counsel to represent them in the negotiations. During the negotiations, respondent sought advice from the officers of Maltby-Thurston Hotels, Inc., by which he had been employed for many years. On December 18, 1953, Maltby-Thurston Hotels, Inc., the payee, endorsed the note without recourse to respondent.

On December 28, 1953, the parties executed a document mutually releasing the other of all claims and demands

---

[3]"A. The financial condition of the Mount Vernon Hotel Company has been precarious, barely breaking even over the last two or three years. One of the reasons the lease was terminated was because Mr. Gilliland was in financial difficulties. We saw no way to terminate those difficulties except to settle accounts and get a new start."

arising out of the lease. Thereafter, respondent successfully sued on the note. Defendant appeals.

■ Appellant's principal argument is that respondent's nondisclosure of his ownership of the note at the time of the execution of the mutual release was fraudulent. This depends upon whether or not there was a duty owing by the respondent to the appellant in this respect. Judge Dunbar said exactly that in writing the court's opinion in *Opie v. Pacific Inv. Co.*, 26 Wash. 505, 67 Pac. 231:

"The difficulty is not so much in stating the general principles of law, which are pretty well understood, as in applying the law to particular groups of facts."

Appellant contends that respondent was a fiduciary and, therefore, was under a duty to speak, but the court found that the parties were dealing at arms' length. We agree.

W. J. Valentine, one of the group which purchased a controlling interest in appellant corporation in 1951 and appellant's secretary, testified that, at the time of the stock purchase, he understood the corporation was free of debt. He later corrected his testimony and said that he knew of the Washington Mutual mortgage but did not learn of the notes until the first meeting of the stockholders following the stock purchase by the Mount Vernon group.

All witnesses agreed that, during the settlement negotiations, when respondent was asked to induce Maltby-Thurston Hotels, Inc., to surrender the note to the appellant, he refused point-blank, which refusal appellant did not misunderstand. Appellant did not inquire of the officers of Maltby-Thurston Hotels, Inc., although they were readily accessible by telephone. Appellant was not misled, but its officers were careless.

■ Appellant's officers testified that they were friendly toward respondent, and they appreciated his generosity in temporarily running the hotel for them until they could find their own manager. They testified as to their confidence in him, but he steadfastly refused to undertake their request that he obtain the note in question for them. But this does not make respondent a fiduciary, for he declined. Respondent's favor in temporarily running appellant's hotel

did not change the situation, for he never had a part in the corporate affairs.

*Hood v. Cline,* 35 Wn. (2d) 192, 212 P. (2d) 110, and *Collins v. Nelson,* 193 Wash. 334, 75 P. (2d) 570, demonstrate that such does not make one a fiduciary. In the latter we said:

"To establish a fiduciary relationship upon the violation of which fraud is sought to be based, there must be something more than mere friendly relations or confidence in another's honesty and integrity. There must be something in the particular circumstances which approximates a business agency, a professional relationship, or a family tie, something which itself impels or induces the trusting party to relax the care and vigilance which he otherwise should, and ordinarily would, exercise."

See, also, *Wilson v. Zorb,* 15 Cal. App. (2d) 526, 59 P. (2d) 593.

The respondent did not attempt to prevent appellant's attorneys and directors from making an inquiry of the Maltby-Thurston Hotels, Inc., the payee of the note. He did nothing to throw them off the track. Of course, resort to trick or artifice, to prevent an adversary from discovering the truth, is equivalent to active misrepresentation.

Respondent made no representations as to his financial condition, nor did the appellant make inquiry of him in this respect. On the contrary, it acted solely upon the judgment of its directors and attorneys, which is a far cry from fraud by respondent.

Under such circumstances the law is as stated by the United States supreme court in *Cleaveland v. Richardson,* 132 U. S. 318, 33 L. Ed. 384, 10 S. Ct. 100, when it quoted with approval the opinion of the court of appeals of New York in *Graham v. Meyer,* 99 N. Y. 611, 1 N. E. 143:

" 'But the defendant was not bound to make any disclosure of his financial condition. He was not asked to make any. He made no misrepresentations, and did nothing to mislead Graham, or prevent him from inquiring, or to throw him off from his guard. They negotiated at arms' length. The defendant was in no trust or confidential relation with him. It is true that he had made an assignment, and had thereby created a trust for Graham's benefit. But he was

not the trustee. He bore the simple relation to him of debtor, and he had the right to make the best compromise with him he could, using no fraud or culpable artifice to accomplish the result. Each party to such a compromise has the right to the advantage which his superior skill, foresight and knowledge may give him. The business of the world can be conducted upon no other basis. If either party desires information from the other, he must ask for it, and then he must not be misled or deceived by answers given.' "

Other cases are collected in the margin.[4]

The law does not operate in a vacuum. One is entitled to keep his affairs to himself unless, by reason of some special circumstance, the law imposes a duty to speak. If there is a duty to speak, however, failure to do so may be as fraudulent as active deception. The difficulty is in determining the existence of such a duty. No rigid classification can be made. However, some classifications may be mentioned—attorney and client, physician and patient, principal and agent, partners, joint adventurers, applicants for insurance, inquiries respecting a material matter and where only a partial disclosure is made, and representations changed by subsequent events (duty to correct).

■ The applicable rule of law is stated in the text of 23 Am. Jur. 851, 852, § 77, as follows:

"As a general rule, to constitute fraud by concealment or suppression of the truth there must be something more than mere silence, or a mere failure to disclose known facts. Where there is no obligation to speak, silence cannot be termed 'suppression,' and is not a fraud. Either party may, therefore, be innocently silent as to matters upon which each may openly exercise his judgment."

Our own cases are in accord. *Opie v. Pac. Inv. Co., supra*; *Farmers State Bank of Newport v. Lamon*, 132 Wash. 369, 231 Pac. 952, 42 A. L. R. 1072.

---

[4]*Holman v. Gulf Refining Co.* (C.C.A. 5th, 1935), 76 F. (2d) 94; *Blakeslee v. Wallace* (C.C.A. 6th, 1930), 45 F. (2d) 347; *In re Nuttall,* 201 Fed. 557, 560; *Daly v. Busk Tunnel R. Co.,* 129 Fed. 513; *The Western Grain Co. Cases* (1955), 264 Ala. 145, 85 So. (2d) 395; *Stoufflet v. Duplantis,* 208 La. 186, 23 So. (2d) 41; *Kapiloff v. Abington Plaza Corp.,* 59 A. (2d) (D.C. Mun. App.) 516; *Multnomah County v. Dekum,* 51 Ore. 83, 93 Pac. 821.

Appellant cites many cases which have no application to the problem presented. We shall not discuss all of them, but the following are illustrative:

*Ikeda v. Curtis,* 43 Wn. (2d) 449, 261 P. (2d) 684, decides no more than the truth of the ancient aphorism that "half the truth is often a great lie." When one is asked for information, he may decline, but if answer is undertaken, he must tell the whole truth. When the seller in *Ikeda v. Curtis, supra,* was asked about the hotel's income, he undertook to answer but concealed the fact that the major portion of the income was illegal.

In *Salter v. Heiser,* 36 Wn. (2d) 536, 219 P. (2d) 574, the court said in words that the parties were not dealing at arms' length.

In *Gray v. Reeves,* 69 Wash. 374, 125 Pac. 162, there was an active misrepresentation made for purposes of inducement.

*Perkins v. Marsh,* 179 Wash. 362, 37 P. (2d) 689, was an action to recover rent under a written lease of a building for a retail automobile business. The court in words said that "It is true that, in the absence of a duty to speak, silence as to a material fact does not of itself constitute fraud," but the lessor knew that the basement flooded during the rainy season which he concealed from the lessee. Such is a specific exception to the rule that silence does not constitute fraud.

"Where there are concealed defects in demised premises, dangerous to the property, health or life of the tenant, which defects are known to the landlord when the lease is made, but unknown to the tenant, and which a careful examination on his part would not disclose, it is the landlord's duty to disclose them to the tenant before leasing, and his failure to do so amounts to a fraud."

*Carpenter Lbr. Co. v. Hugill,* 149 Wash. 45, 270 Pac. 94, involved a contract of suretyship and may be at once put aside with the statement that in applications for insurance there is a duty of full disclosure. Suretyship is a special exception.

"The contract of suretyship imports entire good faith and confidence between the parties in regard to the whole transaction." 50 Am. Jur. 1011, § 163.

Disclosure of all material facts is, likewise, required in all insurance applications. 37 C. J. S. 244, 249, § 16 (d), note 34.

We are told that *Frost v. Perfield,* 44 Wash. 185, 87 Pac. 117, is controlling in the present controversy, but this is a misconception. Perfield made himself the agent of the plaintiff, who, while in Alaska, requested that he pay her taxes out of her moneys then in his hands. He agreed to attend the tax foreclosure sale and bid the property in "if it did not sell too high." Instead, he breached his fiduciary duty to his principal by purchasing the property for himself.

The important factors are indicated by the following passages in our opinion in *Frost v. Perfield, supra*:

"It is very evident, however, from the evidence, that the appellants understood the letter which they received from respondent to mean that he would buy in the property as their agent. . . . When he received that letter, it was optional with him whether he would comply with their request or not. He could have declined to do anything in the matter, or he could have written and told them to secure the services of some other person. Instead of doing this, he complied with the request to the extent of going to Tacoma and making inquiries at the county treasurer's office relative to these taxes. When he did this, he constituted himself the agent of appellants."

Here, on the other hand, when asked by appellant's officers to get the note for the appellant corporation, respondent point-blank refused to do so. There is not even a contention that appellant relied upon him to do so. Appellant did nothing and now asks the court to protect it from its own folly.

Perfield was Mrs. Frost's agent, to whom he owed fidelity, while respondent refused to become appellant's agent.

■ The note having been given in retirement of its preferred stock, appellant contends that the note was without consideration because corporate funds were used to retire the preferred stock. The court, however, found to the contrary. We are urged to make a contrary determina-

tion because of the testimony of a witness based entirely upon an examination of the company records, the conclusions of the witness based thereon, and upon his conversation with an employee in the accounting department in the Maltby-Thurston Hotels, Inc. The admissibility of the evidence itself is not free from doubt. The trial court was not convinced that corporate funds were used to buy the preferred stock, and the appellant's evidence is purely speculative. No one with testimonial knowledge testified that corporate funds were so used. The trial court's comment is set out in the margin.[5] We cannot substitute our judgment for that of the trial court under such circumstances. *Fischler v. Nicklin, ante* p. 518, 319 P. (2d) 1098.

■■ Appellant contends that the note has not matured and bases this contention upon three grounds: (1) That the resolution of the stockholders, authorizing the board of directors to execute the note, provides that it shall be paid only if the Mount Vernon Hotel Company has the funds required; (2) that at the first meeting of the board of directors, after the change in the stock ownership, the president of the company told the new directors the note was payable at will; and (3) that the company never has had

[5]". . . In the first place, I am not satisfied from the proof that corporate funds were used to buy the preferred stock. The conclusions of the witness, which were expressed in Exhibit 24, I do not believe have probative value since I believe they require speculation and may not at all be reasonable if one could see the whole record of how and for what purpose the Maltby-Thurston Hotel funds were used by the Defendant corporation.

"The red line on Exhibit 24 apparently stems from this unsigned one-sheet statement which was originally admitted as a part of one exhibit, being attached to minutes, and I have heretofore indicated that I feel that doesn't establish anything of importance. The circumstances, from some of the exhibits, of the subsequent conduct of the corporation, the fact that this occurred quite a number of years ago when there were few interested parties other than the owners of the common stock who were Maltby-Thurston Hotels and, as I recall, the Moen trustee, the conduct of the corporation in the manner in which they finally concluded the matter, the execution of the promissory notes, the entire testimony, including some of these circumstances, leaves me in the frame of mind that the Court would be invited to speculate to say that the note was not valid because there was no consideration for it. Also, I have doubt that the Defendant is in a position in this proceeding at this time to raise the question."

the funds with which to pay the note.

This argument fails because of the fundamental misconception of the resolution itself, which, so far as material, is set out in the margin.[6] The resolution does not restrict payment of the note to available funds. The note is in the usual form without restrictions. It provides for periodic installments. The language emphasized in the resolution to make payments upon the said notes using "such of the available cash of the corporation as the Board may deem advisable from time to time" may be disregarded as surplusage, but, if it does have meaning, it is to authorize the board to provide funds for the payment or to make payments against unaccrued installments. There is no restriction upon payment contained in the resolution. In any event, the stockholders do not control corporate affairs. RCW 23.36.010 vests that power in the board of directors and not in the stockholders. Had the parties intended that the maturity of the note should await the time when the respondent had surplus funds, apt language would have been inserted in the note. To sustain the construction urged by the appellant would vest the respondent with the power to forever prevent the maturity of the note.

Affirmed.

HILL, C. J., ROSELLINI, OTT, and HUNTER, JJ., concur.

---

[6] " . . . 'That the Board of Directors be and is hereby expressly and specifically authorized by the Stockholders of this corporation, to use $23,412.24 of the Corporation's cash as from time to time the same becomes available, to obtain and complete the cancellation and retirement of all of the preferred stock of this corporation, with the exception of ten shares thereof hereinafter to be dealt with, and all of which has been called and money obtained for the purpose of cancellation thereof; 473 shares of which have been acquired by G. O. Moen, Trustee, and in thus making such total payment the Board of Trustees may either apply all available cash toward the payment of said obligation without payment of further dividends until the same is wholly paid, or is authorized to execute the promissory notes of said corporation bearing interest at the rate of 3% per annum due over a period of several years, and use such of the available cash of the corporation as the Board may deem advisable from time to time, to make payments upon said notes and use the remainder of available cash for payment of periodic dividends upon the common capital stock of the corporation, or work out any other adjustment and settlement of said obligation, using therefor no more than $23,412.24 for payment of the principal of said obligation. . .' "