IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| ALLEGIANCE PROPERTIES, LLC, a Washington Limited Liability Company, and ROBERT A. GILLES, INC., a Washington corporation, | ) ) ) ) ) | No. 39294-5-III |
| Respondents, | ) ) | |
| | ) | UNPUBLISHED OPINION |
| v. | ) ) | |
| NATHAN KEEN, as personal representative of the estate of JANET E. RICHART; and Does 1-10, | ) ) ) ) ) | |
| Appellants. | ) | |

STAAB, J. — The buyers of commercial real estate, Allegiance Properties, LLC

and Robert A. Gilles, Inc. (Allegiance) sued the seller, Janet Richart, for breach of

contract as well as fraudulent and negligent misrepresentation.  Allegiance asserted that

Richart made affirmative misrepresentations about the condition of the property and

failed to disclose material defects prior to closing, including the existence of underground

storage tanks and the need to replace the roofs.[1]  Richart denied liability and filed a

---

[1] At the time this matter was filed, the plaintiffs were Allegiance Properties, LLC, and Robert A. Gilles, Inc.  During the pendency of this litigation Gilles passed away. Following his passing, Allegiance purchased his interest.  For clarity purposes, the appellants will be referred to as Allegiance.  Additionally, Janet E. Richart was the named defendant.  During the pendency of this litigation, Richart passed away and Nathan Keen, as personal representative, was substituted as the defendant.  For clarity purposes, we refer to the respondent as Janet E. Richart.

counterclaim for breach of contract.  Following a bench trial, the court concluded that

Allegiance had proven all three claims and entered a judgment for general damages based

on the cost to replace the roof and remove the underground tanks.

Richart appeals, challenging numerous findings and conclusions, and generally

argues that Allegiance failed to prove its claims.  Richart also challenges the trial court's

dismissal of her counterclaim.  We affirm the trial court's judgment and award of

damages.  However, we agree with Richart that the trial court erred in determining that

Richart was precluded from prevailing on her counterclaim.  We remand with

instructions to enter a judgment in favor of Richart on her counterclaim.  We grant each

party the portion of their attorney fees on appeal that is associated with their successful

claims.

BACKGROUND

*Richart's ownership history*

Unless otherwise noted, the following facts are from the trial court's extensive

findings of fact.

In May 2001, Janet Richart purchased an interest in a commercial building located

at 1007 and 1017 W. Carlisle Avenue in Spokane, Washington (the Property).  Richart

had previously acquired the Property from Michael J. O'Brien and Marguerite V.

O'Brien.  The Property included a brick building constructed in 1907.  Atop the building

were two flat roofs, commonly referred to as the "upper roof" and the "lower roof."  The

upper roof covered the two-story portion of the building while the lower roof covered the single story. The building was divided into multiple units designed for leased office or retail space.

Between approximately 1993 and May 2001, Richart leased a portion of the Property from the O'Briens to run her antique business. On January 6, 1998, Richart opened accounts with Banner Furnace and Fuel to supply stove and furnace oil for her retail space. Between 1998 and 2007, Banner Furnace and Fuel delivered stove and furnace oil to the Property. During that time, an employee of Banner Furnace and Fuel noted evidence of multiple underground storage tanks located behind the building. In addition, this employee had delivered stove oil to an above-ground storage tank and furnace oil to an underground storage tank. City of Spokane records reveal that underground storage tanks were first permitted on the Property in 1937 and, from that year to 1953, 14 permits were granted by the City for the installation of underground tanks on the Property.

Between 1999 and 2001, Kevin McKee, the managing partner for Allegiance, and Robert Gilles managed the Property for the O'Briens. Neither McKee nor Gilles ever inspected the roofs or dealt with issues concerning the building's heating system. Rather, they were responsible for facilitating the need for maintenance or repairs.

In April 2001, before she purchased the Property, Richart procured a visual inspection report (Pillar to Post Report). Under the subheading "FUEL SOURCE," the report disclosed:

> There are several old pipes going into the ground on the SW corner of the building. It would be advisable to get information from the owner on the status of these tanks. Recommend checking with local fire department for closure and removal of these tanks. Normally they are to be closed and removed after 12 months, recommend further investigation.

CP at 2271. As it related to the building's roofs, the Pillar to Post Report twice noted issues with the roof:

> There are some areas on the upper roof that should have some maintenance to reduce chances of leaking and damage. The edge of the roofing on the south side of the Carlisle portion of the building is not sealed and is held down by some concrete blocks. [R]ecommend fixing.

> There is a small roof on the front of the building that should be resealed to reduce further leaking and damage to soffit.

CP at 2271

In approximately 2010, after Richart had purchased the property, she obtained two estimates to have the roof replaced. On October 31, 2011, Richart received a third bid to have the roof replaced. Justin Ulmer, of J.U. Roofing, informed Richart that the roof needed to be replaced, rather than repaired, and provided an estimate to complete the project.

4

*Preliminary negotiations of the sale from Richart to McKee.*

In October of 2015, Richart and McKee discussed the sale of the building to Allegiance. Richart's real estate agent, Ryan Towner, prepared a Purchase and Sale Agreement (PSA), in which Richart offered to sell her interest in the Property to Allegiance for $410,000. At the direction of Richart, Towner drafted and delivered the PSA on November 4, 2015 to McKee.

Section 5 of the proposed PSA granted Allegiance a 30 day contingency period (Feasibility Contingency), in which to rescind the transaction if not satisfied with the condition of the Property. The paragraph stated, in part:

> Buyer's obligations under this Agreement are conditioned upon Buyer's satisfaction in Buyer's sole discretion, concerning all aspects of the Property, including its physical condition; the presence of or absence of any hazardous substances . . . . This Agreement shall terminate and Buyer shall receive a refund of the earnest money unless Buyer gives written notice to Seller within 30 days . . . (the "Feasibility Period") of Mutual Acceptance stating that this condition is satisfied.

CP at 2273.

Additionally, in Section 12 of the PSA, Richart made certain representations about the condition of the Property:

> SELLER'S REPRESENTATIONS . . . (h) Seller is not aware of any concealed material defects in the Property except as disclosed to Buyer in writing during the Feasibility Period (i) There are no Hazardous Substances . . . currently located in, on, or under the Property in a manner or quality that presently violates any Environmental Law . . . [T]here are no underground storage tanks located on the Property.

5

CP at 2273-74.

After November 4, 2015, Richart and McKee continued to negotiate the price for the commercial building. By November 10, Richart reduced her asking price to $405,000.

That same day, Richart signed a Seller's Disclosure Statement (Form 17). On Form 17, Richart checked boxes that declared she did not know if the Property contained any environmental substances or contamination and that she did not know whether any fuel storage tanks were present on the Property. Additionally, she checked the box "yes" to the question whether the roof had leaked within the past five years and wrote that the roof had leaked around the upstairs skylight in the 1007 W. Carlisle bathroom.

The words "to survive closing" were handwritten on the form. The parties disputed who made this notation. McKee asserted at trial that Richart made the notation. Based on evidence of hand writing and ink color, the trial court disagreed with McKee and found that Richart did not make this notation. Regardless of who made the notation, the court noted that the phrase "to survive closing" reflected "McKee's reliance on Ms. Richart's representations about the integrity of the property, especially in light of him not being able to obtain a Phase I Environmental Site Assessment." CP at 2280.

After receiving Richart's offer to sell the Property, McKee, on behalf of Allegiance, attempted to hire an inspector that could complete a Phase I Environmental Site Assessment (ESA) of the Property within 30 days. However, McKee was unable to

6

find a local inspector that could complete an ESA within a month. For this reason,

Allegiance requested a 90 day, rather than 30 day, Feasibility Period from Richart. On

November 11, 2015, McKee typed an email to Richart's real estate agent, Ryan Towner,

which read:

> Thanks Ryan. I think we may be just too far apart. At [$]365,000 I'm willing to take the risk. At $405,000 with all the uncertainties, it is just not worth it. Not only are we looking at rehab costs—windows, brickwork, roof, heating, framing, lighting, flooring, plumbing, landscaping, asphalt, drainage—but also the unknowns. The property condition report indicated Jan doesn't know a lot about the answers regarding the shape of the building. Are there buried oil tanks, lead, asbestos? What remediation is the city going to require? What about change of use requirements? I met with the fire marshal yesterday about something else, he was requiring a sprinkler system on that rehab. I suppose if Jan wanted to give me a 90 day feasibility study, and be willing to drop the price if there are any unknown costs or requirements, I could entertain a higher price. Otherwise, I'm done.
> Best of Luck,
> Kevin

CP at 2275.

After receiving McKee's email, Richart lowered the purchase price to $395,000,

but the period to extend the time to complete a feasibility study was not extended.

"Without time to have a Phase I Environmental Site Assessment completed, and in

reliance on Ms. Richart's representations about the condition of the Property, on

November 15, 2015, Kevin McKee, as the managing partner of Allegiance, signed the

Purchase and Sale Agreement." CP at 2276. The parties amended a single term of the

contract, which was an extension of the time period for closing of the sale.

Sections 5 and 12, the paragraphs authorizing a Feasibility Period and the Seller's Representations, remained unchanged in the executed PSA. The trial court found that within section 12 Richart made specific guarantees about the integrity of the Property.

In addition to Sections 5 and 12, the final PSA included several additional sections relevant to this appeal. An integration clause in Section 22 provided:

> a. Complete Agreement. This Agreement and any addenda and exhibits thereto state the entire understanding of Buyer and Seller regarding the sale of the Property. There are no verbal or other written agreements which modify or affect the Agreement.

CP at 2277. Section 3 of the PSA incorporated three documents: a one-page legal description, a one-page addendum to amend the PSA, and the financing addendum. No other documents were identified or incorporated in section 3 of the PSA.

The parties disputed whether a separately prepared Inspection Addendum was integrated into the PSA. The Inspection Addendum was dated November 3 and signed on November 10, 2015. Although the Inspection Addendum provides that it is part of the PSA, the trial court found that the Inspection Addendum was not integrated into the PSA as an addendum. The court noted that the inspection addendum was dated and signed by Richart before the parties executed the PSA. The court reasoned that,

> [g]iven the integration clause under Section 22.a of the Purchase and Sale Agreement, had the parties intended the Inspection Addendum (which was already in existence) be incorporated into the Purchase and Sale Agreement, it would have been referenced in Section 3 of the Purchase and Sale Agreement.

CP at 2278.

8

*Closing of the Sale*

Before closing of escrow, Allegiance did not conduct any feasibility studies or inspections, including an ESA. Pursuant to the terms of the PSA, the Property was purchased through seller financing. The purchase of the Property was secured through both a "Promissory Note" and a "Deed of Trust." The third-party defendants in this case, Kevin McKee, Sandra Cozza, Gavin McKee, and Heather McKee, all executed a Guarantee.

After closing, Allegiance took possession of the Property. Within one week, Richart, as tenant of the Property, complained to McKee that water was leaking from the roof. McKee contacted J.U. Roofing to diagnose the problem and was informed that Richart had been aware the roof needed to be replaced since October 2011. Additionally, an inspector from the City of Spokane found evidence of underground storage tanks on the Property. McKee contacted Rob's Demolition, a company that removes underground storage tanks. "Without prior consent from Richart, and in violation of the Deed of Trust, Allegiance demolished the detached garage structure, removed portions of the balcony, removed portions of the roof, removed five underground storage tanks, closed four underground storage tanks, and made renovations to the second floor." CP at 2419.

*Procedural History*

Allegiance brought a lawsuit against Richart, asserting claims for breach of contract, fraud, negligent misrepresentation by affirmative statements and failure to

disclose, and declaratory relief. Richart filed a counterclaim against Allegiance and a

third-party claim against third-party defendants Kevin McKee, Sandra Cozza, Gavin

McKee, and Heather McKee, alleging breach of the terms of the Promissory Note and

Deed of Trust.

Initially, the trial court granted Richart's motion for summary judgment,

dismissing most of Allegiance's claims. Allegiance appealed and this court reversed,

holding that Allegiance had produced sufficient evidence to raise genuine issues of

material fact on its claims of fraud and misrepresentations, thereby precluding resolution

of these claims on summary judgment. *See Allegiance Properties, LLC v. Richart*, No.

36896-3-III, slip op. at 9 (Wash. Ct. App. Nov. 3, 2020) (*Allegiance* I) unpublished,

https://courts.wa.gov/opinions/pdf/368963.pdf. The case was remanded and proceeded to

a bench trial.

*Trial*

At trial, testimony was given by several individuals involved with the case.

Richart testified by way of deposition. She had difficulty remembering details pertaining

to her purchase of the Property. At one point, she acknowledged that she knew there

were underground tanks after reading the Pillar to Post Report in April 2001, but she

testified that she did not remember the existence of the underground tanks at the time she

sold the Property to Allegiance. She explained that she was extremely ill from what she

remembers as the time period from 2012-2014, which caused memory issues for her. In

addition, she answered that the first time she recalled the existence of the underground

storage tanks was when she was sued and she looked at the inspection report, which

stated it was unknown if there were oil tanks, and she realized she remembered

incorrectly.

*Findings and Conclusions*

Following trial, the court entered extensive written findings and conclusions.  The

court concluded that Allegiance had prevailed on its claim for breach of contract.  It

found by a preponderance of the evidence that Allegiance had proved that Richart made

specific guarantees in the PSA that the Property did not include underground tanks and

did not have any material concealed defects, that Richart breached this guarantee by

selling Property that included underground tanks and a roof that needed to be replaced,

and Allegiance sustained damages as a result of the breach.

Additionally, the trial court concluded that Allegiance prevailed on its fraud claim

because it proved by clear, cogent, and convincing evidence:

> (1) that Ms. Richart made representations that there were no underground
> storage tanks on the Property and no concealed material defects in the
> Property; (2) that Ms.  Richart's representations were material, as it severely
> affected the value of the Property and induced Allegiance to purchase the
> Property; (3) that Ms. Richart's representations were false; (4) that Ms.
> Richart knew of the falsity of her representations; (5) that Ms. Richart
> intended Allegiance would rely on her representations; (6) that Allegiance
> was ignorant of the falsity of Ms. Richart's representations of the presence
> of underground storage tanks and concealed material defects in the Property;
> (7) that Allegiance relied upon the truth of Ms. Richart's representations; (8)
> that Allegiance had a right to rely on Ms. Richart's representation regarding

11

the integrity of the Property; and (9) that Allegiance suffered damages as a result of Ms. Richart's false representations.

CP at 2294-95.

The trial court also concluded that Allegiance prevailed on its negligent misrepresentation claims.

Finally, the trial court found Richart failed to prevail on her counter-claim. While finding that Richart had proved that Allegiance breached the terms of the Deed of Trust, the court concluded that Richart had failed to prove "(1) that she was not already in breach of the contract when Allegiance breached the contract and (2) that she has been damaged as a result of Allegiance's breach." CP at 2298.

Based on its conclusion that Allegiance had proved three causes of actions, the court awarded unsegregated damages in favor of Allegiance for the cost of removing or filling the underground tanks and repairing the roof, along with reasonable attorney fees.

Richart now appeals.

ANALYSIS

Richart challenges the trial court's conclusion that Allegiance had proved its claims for breach of contract, fraud, and negligent misrepresentation. In addition to assigning error to numerous findings of fact, Richart asserts that the trial court failed to apply the correct law. Generally, Richart contends that these three causes of action

12

require a buyer to conduct a reasonable pre-purchase inspection and a seller cannot be held liable for defects that could have been discovered during such an inspection.

As a preliminarily matter, we note that the trial court awarded unsegregated damages based on the cost to remove the tanks and replace the roof without allocating the damages between the three causes of action; essentially finding that any one of the claims would independently support the award of damages. Since we determine that at least two of Allegiance's causes of action are supported by the court's findings and conclusions, we affirm the judgment in favor of Allegiance.

1. CHALLENGED FINDINGS OF FACT

Following a bench trial, we review the trial court's findings of fact and conclusions of law. Unchallenged findings constitute verities on appeal. *In re Est. of Jones*, 152 Wn.2d 1, 8, 93 P.3d 147 (2004). Challenged findings are verities if they are supported by substantial evidence. *In re Marriage of Black*, 188 Wn.2d 114, 127, 392 P.3d 1041 (2017). "Substantial evidence" requires us to determine if the evidence is "sufficient to persuade a rational, fair-minded person of the truth of the finding." *Jones*, 152 Wn.2d at 8. The evidence and all reasonable inferences are considered in a light most favorable to the prevailing party. *Real Carriage Door Co., Inc. ex. rel. Rees v. Rees*, 17 Wn. App. 2d 449, 457, 486 P.3d 955 (2021). "We do not review the trial court's credibility determinations or weigh conflicting evidence 'even though we may disagree

with the trial court in either regard.'" *Black*, 188 Wn.2d at 127 (quoting *In re Welfare of Sego*, 82 Wn.2d 736, 740, 513 P.2d 831 (1973)).

Richart assigns error to 21 of the court's 102 findings of fact. *See* Appellant's Br. at 4-9. However, beyond assigning error to these findings, Richart does not provide analysis in the argument section as to why these findings are not supported by substantial evidence. Instead, within the assignments of error, Richart sets forth one or two sentences supporting the assignment of error. It is not enough to assign error to a trial court's findings or conclusions. The appellant must also provide argument and analysis, with citation to the record and legal authority, on why challenged findings are not supported by substantial evidence. *See* RAP 10.3(a)(6).

Here, the short contentions made by Richart (1) fail to analyze how the challenged findings are not supported by substantial evidence, (2) point to conflicting evidence, (3) suggest that the court of appeals made contrary findings in a prior appeal, or (4) argue that the findings were irrelevant because the law and the contract required Allegiance to perform a pre-purchase inspection.

As stated above, our review of challenged findings on appeal is very limited. We do not reweigh conflicting evidence. When we review a summary judgment order dismissing claims, as we did in *Allegiance* I, we consider the facts in a light most favorable to the nonmoving party. But "[a]ppellate courts do not hear or weigh evidence,

14

find facts, or substitute their opinions for those of the trier-of-fact." *Quinn v. Cherry Lane Auto Plaza, Inc.*, 153 Wn. App. 710, 717, 225 P.3d 266 (2009).

Here, the trial court found that Richart did not make the notation "to survive closing" on Form 17. The court relied in part on the handwriting and color of ink. Regardless of any contradictory evidence, there was substantial evidence to support this finding.

Likewise, the court found that Richart made representations in the PSA that there were no underground storage tanks or concealed material defects, and at the time she made this representation she knew that there were underground storage tanks and the roof needed to be replaced. These findings were based on the testimony of Richart, the Pillar to Post Report she commissioned, the testimony from the Banner Fuel employee, and the testimony of roofing contractors who had told Richart that the roof needed to be replaced. While Richart testified that at the time she signed the PSA she did not remember the existence of the tanks, the court could discredit this testimony based on competing inferences and evidence.

Likewise, the court found that the Inspection Addendum was not integrated into the PSA. The court noted that the Inspection Addendum pre-dated the PSA and the PSA did not include the Inspection Addendum in the integration clause despite integrating other addendums. In *Allegiance* I, we presumed that the inspection addendum was integrated into the PSA for purposes of summary judgment review. However, the court

15

of appeals did not find this contention to be true (as we do not make findings of fact). At trial, the court found otherwise. We will not disturb this finding because it is supported by substantial evidence.

We conclude that Richart has failed to demonstrate that any of the court's findings are not supported by substantial evidence. As such, we consider them as verities on appeal and consider whether the court applied the correct law and whether the findings support the trial court's conclusions of law. *See Black*, 188 Wn.2d at 127 (noting that challenged findings are verities if they are supported by substantial evidence.).

2. BREACH OF CONTRACT CLAIM

Richart challenges the trial court's conclusion that she breached the PSA. However, Richart's entire argument on this point contends that "[w]hen a plaintiff's claim for breach of contract is based on the same facts supporting allegations of fraudulent concealment and negligent misrepresentation and those claims fail, plaintiff's claim for breach of contract also fails." Appellant's Br. at 46. In support of this argument, Richart cites a footnote in *Douglas*. *Douglas v. Visser*, 173 Wn. App. 823, 834 n.3, 295 P.3d 800 (2013). In the footnote, the court noted that the plaintiff's breach of contract claim *in that case* was based on fraudulent concealment and negligent misrepresentation. *Id*. "When those claims fail, so does the breach of contract claim."

We do not read the footnote in *Douglas* as holding that all claims for breach of contract based on misrepresentations will always be identical to claims of fraud and

negligent misrepresentation when the claim rely on the same conduct. Instead, the holding in *Douglas* was fact-specific.

Here, Allegiance's breach of contract claim is based on some of the same evidence used to support its claim for fraud and negligent misrepresentation. But the fraud and negligent misrepresentation claims also relied on the representations made in Form 17 that was not part of the PSA. Regardless, as we note below, Allegiance's fraud claim is supported by the trial court's findings and conclusions.

The trial court concluded that the elements of Allegiance's claim for breach of contract were different than the elements for its claims of fraud and negligent misrepresentation. The trial court found that Richart made certain guarantees in the PSA regarding the roof and underground tanks, and breached the contract when she failed to deliver on this guarantee. Breaches of guarantees or warranties can constitute a breach of the contract. 25 WASHINGTON PRACTICE, CONTRACT LAW AND PRACTICE § 9:10, at 285 (3d ed. 2014).

Although Richart challenges these findings and conclusions, her only analysis is that Allegiance's breach of contract claim was the same as its claims for fraud and negligent misrepresentation. While this can be true, depending on the facts of a case, it is not true here.

We conclude that Richart has failed to demonstrate that the trial court's conclusions of law on Allegiance's breach of contract claim were not supported by the

findings or were an inaccurate statement of the law. As an appellate court, we can affirm

a judgment or sustain an order on any basis supported by the pleadings and the record.

*Burnet v. Spokane Ambulance*, 131 Wn.2d 484, 493, 933 P.2d 1036 (1997). Because we

find no error in the trial court's conclusion that Richart breached the parties' contract, and

because the award of damages was the same for each claim, we can affirm the judgment

without a lengthy analysis of Allegiance's fraud and negligent misrepresentation claims.

3.   FRAUD

Although we can affirm based solely on our analysis of Allegiance's breach of

contract claim, we consider Allegiance's fraud claim and affirm the trial court's

conclusion that fraud was proved at trial. We review conclusions of law de novo and

consider whether they are supported by the trial court's findings. *Littlefair v. Schulze*,

169 Wn. App. 659, 664, 278 P.3d 218 (2012).

*A.  Common Law Fraud or Fraudulent Concealment*

Richart contends that the trial court's conclusion that Allegiance proved common

law fraud was error because the trial court failed to apply the elements of fraudulent

concealment. Richart asserts that unlike fraud, fraudulent concealment imposes a duty on

the buyer to perform a pre-purchase inspection of the Property and precludes liability for

discoverable defects.

The torts of fraud and fraudulent concealment are related but distinct. *See*

*Jackowski v. Borchelt,* 174 Wn.2d 720, 738, 278 P.3d 1100 (2012) (distinguishing

18

between claims of fraudulent concealment and fraud); *Nguyen v. Doak Homes, Inc.*, 140 Wn. App. 726, 731, 167 P.3d 1162 (2007) (noting that fraudulent concealment is "a species of fraud"). With respect to real estate transactions, a fraud claim generally involves an affirmative representation of an existing fact that is material, known to be false, and made by the seller to induce a transaction.[2] The tort of fraud does not create a duty to disclose. "Where there is no obligation to speak, silence cannot be termed 'suppression,' and is not a fraud." *Gilliland v. Mount Vernon Hotel Co.*, 51 Wn.2d 712, 717, 321 P.2d 558 (1958); *see also Dussault ex rel. Walker-Van Buren v. Am. Int'l Grp., Inc.*, 123 Wn. App. 863, 871, 99 P.3d 1256 (2004).

Fraudulent concealment, on the other hand, can be established by pleading and proving that the defendant breached an affirmative duty to disclose a material defect. The duty to disclose can arise when the seller has knowledge of a concealed defect that presents a danger to the property or the health of the buyer, the buyer is unaware of the defect, and the defect would not be discovered by the buyer's careful, reasonable inspection. *Douglas*, 173 Wn. App. at 833. Unlike fraud, a claim of fraudulent concealment includes concealment by omission. In addition, a claim of fraudulent

---

[2] There are nine elements of fraud: "(1) representation of an existing fact; (2) materiality; (3) falsity; (4) the speaker's knowledge of its falsity; (5) intent of the speaker that it should be acted upon by the plaintiff; (6) plaintiff's ignorance of its falsity; (7) plaintiff's reliance on the truth of the representation; (8) plaintiff's right to rely upon it; and (9) damages suffered by the plaintiff." *Stiley v. Block*, 130 Wn.2d 486, 505, 925 P.2d 194 (1996).

concealment requires the buyer to prove that the defect could not have been discovered upon reasonable inspection. *Id.* Both fraud and fraudulent concealment require proof of clear, cogent, and convincing evidence. *Stieneke v. Russi*, 145 Wn. App. 544, 565, 190 P.3d 60 (2008).

Here, Allegiance pleaded common law fraud in its complaint, based on affirmative representations made in the PSA and Form 17; it did not plead fraudulent concealment. Richart claims that despite Allegiance's pleaded claim of fraud, our Supreme Court has held that fraud claims based on property defects not disclosed during the sale of property must be based on the elements of fraudulent concealment. Appellant's Br. at 32-33 (citing *Alejandre v. Bull*, 159 Wn.2d 674, 153 P.3d 864 (2007)). We disagree with this characterization of *Alejandre* and its application to this case.

In *Alejandre*, the Supreme Court held that the plaintiff's claim for fraudulent concealment was not barred by the economic loss rule,[3] but otherwise failed because the plaintiff did not present sufficient evidence to support the claim. *Id.* at 689. The court went on to address the plaintiff's separate and distinct common law fraud claim. *Id.* at 690. The court did not hold, as Richart suggests, that all fraud claims based on defects in a property sale must proceed under a theory of fraudulent concealment. Here,

---

[3] In *Eastwood v. Horse Harbor Found.*, our Supreme Court concluded that the "economic loss rule" was a misnomer and renamed the rule the "independent duty doctrine." 170 Wn.2d 380, 393-4, 241 P.3d 1256 (2010).

Allegiance's fraud claim is based on Richart's affirmative misrepresentations regarding the underground tanks and the lack of any concealed material defects; it was not based on Richart's failure to disclose these defects.

We conclude that the trial court did not err by applying the elements of common law fraud as plead by Allegiance in their complaint.

### B. *Justifiable Reliance*

Citing *Alejandre*, Richart also contends that the trial court erred in not requiring Allegiance to prove that the defective roof and underground tanks would not have been discovered upon a careful, reasonable pre-purchase inspection by Allegiance. However, the language cited by Richart refers to an element of fraudulent concealment, not fraud. *Alejandre*, 159 Wn.2d at 689.

While the common law tort of fraud requires a plaintiff to prove justifiable reliance on a false statement, a buyer of real estate is generally entitled to rely on representations made by the seller. *Jackowski*, 174 Wn.2d at 738. Even so, "[w]hen a buyer is on notice of a defect, it must make further inquiries of the seller." *Douglas*, 173 Wn. App. at 830; *see also* RCW 64.06.020 ("Buyer has a duty to pay diligent attention to any material defects that are known to Buyer or can be known to Buyer by utilizing diligent attention and observation."). In other words, a buyer cannot justifiably rely on a seller's representation if the defect is known by the buyer or obvious upon the buyer's

21

inspection even if the Buyer does not appreciate the extent of the defect. *Id*. at 834. But this does create an affirmative duty to independently inspect the property.

Richart also contends that the language of the PSA required Allegiance to conduct an inspection or prove that the defects would not have been discovered by such an inspection. In support of this position, Richart relies on sections 5, 12, and 13 of the PSA. We disagree.

In an unchallenged finding, the trial court found that Section 5 of the PSA granted Allegiance a 30-day contingency period in which Allegiance could rescind the transaction if it was not satisfied with the Property. Section 12 of the PSA includes Richart's representations about the lack of concealed material defects and underground storage tanks, and begins with the preface that "[e]xcept as disclosed to or known by Buyer prior to the satisfaction or waiver of feasibility contingency stated in Section 5 above . . . Seller represents to the Buyer that, to the best of Seller's actual knowledge, each of the following is true." CP at 2274. Section 13 provides that "[e]xcept for those representations and warranties specifically included in this Agreement," the seller makes no representations or warranties.

These sections provide Allegiance with a right to inspect the Property, but do not create a duty to inspect. Nor do any of these sections individually or collectively release Richart from liability for the affirmative representations she makes in the contract should Allegiance choose not to inspect the Property.

Finally, Richart contends that the Inspection Addendum required Allegiance to conduct an inspection of the Property. However, the trial court found that the Inspection Addendum was not integrated into the PSA. Although challenged by Richart, this finding is supported by substantial evidence.

The trial court's conclusion that Allegiance was justified in relying on Richart's affirmative representations is supported by the law and the trial court's findings.

4. RICHART'S COUNTERCLAIM FOR BREACH OF CONTRACT

Next, Richart claims that the trial court erred in failing to enter judgment in her favor on her counterclaim of breach of the Deed of Trust.

The parties agreed that Richart would provide seller financing to Allegiance and several third-parties guaranteed the loan. Allegiance executed a Promissory Note secured by a Deed of Trust on the Property. The Deed of Trust contained a provision that precluded Allegiance from modifying the Property without the prior written consent of Richart. Specifically, this covenant provided:

> No building or other improvement on the property shall be structurally altered, removed, or demolished without the Beneficiary's prior written consent, nor shall any fixture or chattel covered by this Deed of Trust and adapted to the property use and enjoyment of the premises be removed at any time without like consent unless actually replaced by an article of equal suitability owned by the Grantor(s), free and clear of any liens or security interest, except such as may be approved in writing by the Beneficiary.

CP at 2282.

The trial court found that Allegiance violated this provision when it demolished the detached garage, removed portions of the balcony and the roof, removed or filled in the underground storage tanks, and made renovations to the second floor without giving notice to Richart. CP at 2283. The trial court also found that if Allegiance was in default of the Deed of Trust, and failed to cure the default within five days of written notice, that Richart could accelerate the payments due under the Promissory Note. CP at 2283.[4]

Finally, the court found that Section 7 of the Deed of Trust required Allegiance to maintain the buildings and improvements on the Property and not suffer waste. The specific provision provided that in the event of breach of this paragraph, the beneficiary could recover damages or accelerate the installment payments and declare the entire principal due and payable. The provision also provided that "[p]roof of impairment of security shall be unnecessary in any suit or proceeding under this paragraph." CP at 2283.

Ultimately, the trial court concluded that Richart had proved Allegiance had breached the deed of trust by its "failure to provide her five days notice." CP at 2298. Nevertheless, the court concluded that

> Ms. Richart has failed to prove by a preponderance of the evidence: (1) that
> she was not already in breach of the contract when Allegiance breached the

---

[4] In making this finding, the trial court did not cite the specific section of the Deed of Trust it was referencing. A search of the language of the Deed of Trust does not reveal language requiring a cure within five days notice of default and Richart does not cite the provision in the deed supporting this finding. Nevertheless, Allegiance does not challenge this finding and it is therefore a verity on appeal.

contract and (2) that she has been damaged as a result of Allegiance's breach.

CP at 2298.

On appeal, Richart argues that the trial court's finding that she was in breach of the contract is not supported by substantial evidence because there is no evidence that she was in breach of the Deed of Trust. Allegiance responds that "Richart was undeniably in breach of contract the moment she executed the PSA." Br. of Resp't at 69. However, at oral argument, Allegiance acknowledged that the PSA and the Deed of Trust were two different contracts. Wash. Ct. of Appeals oral argument, *Allegiance Properties, LLC et al v. Nathan Keen, et a*l, No. 39294-5-III (Apr. 23, 2024) at 22 min., 38 sec. through 22 min., 42 sec. (on file with court). Nor is either party claiming that the two contracts merged for purposes of this issue.

Without deciding whether Richart needed to show that she was not in breach in order to prevail on her breach of contract against Allegiance,[5] we agree with Richart that the court's finding contained in conclusion of law 36 is not supported by substantial evidence. There was no evidence that Richart was in breach of the Deed of Trust at the time of Allegiance's breach of the Deed.

---

[5] The nonperformance of a promise by one party to a contract does not necessarily excuse the performance of a different promise within the same contract by the other party. Instead, the court should consider whether the parties intended the promises to be conditional. *State v. Trask*, 91 Wn. App. 253, 273-274, 957 P.2d 781 (1998).

Richart also contends that she was not required to prove damages from Allegiance's breach because the Deed specified that acceleration was its own remedy and the beneficiary was not required to provide proof of impairment of her security before exercising this remedy. Allegiance fails to respond to this argument in its brief. Again, we agree with Richart.

Ordinarily, in Washington a plaintiff must prove damages in order to succeed on a claim for breach of contract. *Fid. & Deposit Co. of Md. v. Dally*, 148 Wn. App. 739, 745, 201 P.3d 1040 (2009). However, mortgages and deeds of trust are different.

> A stipulation in a mortgage, providing that the whole debt secured thereby shall become due and payable upon failure of the mortgagor to pay the interest or any installment of principal as it falls due, *or to comply with any other condition of the mortgage*, is a legal, valid, and enforceable stipulation. It is not in the nature of a penalty or forfeiture which a court of equity would refuse to enforce.

*Puget Sound Mut. Sav. Bank v. Lillions*, 50 Wn.2d 799, 802, 314 P.2d 935 (1957) (emphasis added); *see also* 18 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE: REAL ESTATE: TRANSACTIONS § 17.8 (2d ed. 2004).

The trial court found that Allegiance violated the provision in the Deed of Trust by making modifications to the Property without obtaining Richart's consent and failing to cure after notice from Richart. The trial court also found that in the event of such default, Richart could accelerate the amount due under the note. Since there was no evidence that Richart was in breach of the Deed of Trust, and since Richart was not required to prove

damages, the trial court's findings are sufficient to support a judgment in favor of Richart on her counterclaim for breach of the Deed of Trust.

On remand, the trial court should enter judgment on Richart's claim seeking acceleration of the note for breach of the Deed of Trust. In addition, the court should reconsider whether Richart is entitled to attorney fees for prevailing on her counterclaim. *See Cornish Coll. of the Arts v. 1000 Virginia Ltd. P'ship*, 158 Wn. App. 203, 232, 242 P.3d 1 (2010).

5.  ATTORNEY FEES ON APPEAL

Both parties request attorney fees on appeal. Both the PSA and the Deed of Trust provide for attorney fees. These provisions support an award of attorney fees on appeal. *Cornish Coll.*, 158 Wn. App. at 236. Because each party prevailed on appeal on some of its claims, and it is difficult to determine if either party is substantially prevailing, we apply the proportionality approach and award each party attorney fees and costs on appeal for those claims upon which they have prevailed. *Id*. The parties shall make such a request to the commissioner of this court.

CONCLUSION

We affirm the trial court's decision that Allegiance proved its claim for breach of contract and common law fraud against Richart. Since the trial court's award of damages was unsegregated and independently supported by each of Allegiance's three causes of

action, deciding the merits of Allegiance's negligent misrepresentation claim is unnecessary in order for us to affirm the trial court's judgment in favor of Allegiance.

We reverse the trial court's denial of Richart's counterclaim for breach of the deed of trust. Richart was not required to prove damages because the deed provided the alternative remedy of accelerating the debt once she established that Allegiance breached a covenant in the deed. Nor was there any evidence that Richart was in breach of the deed herself.

We remand to superior court to enter judgment in favor of Richart on her counterclaim.[6]

Affirmed in part, reversed in part and remanded.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Staab, J.

WE CONCUR:

_____     _____
Fearing, J.                                   Lawrence-Berrey, C.J.

---

[6] We recognize that the judge who presided over the bench trial is no longer a superior court judge. On remand, a different judge will be able to enter judgment on Richart's counterclaim without finding additional facts.